Filed 1/29/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| MARK COHEN et al., | B266702 |
| Plaintiffs, Cross-defendants, and Respondents, | (Los Angeles County Super. Ct. No. BS139842) |
| v. | |
| TNP 2008 PARTICIPATING NOTES PROGRAM, LLC, et al., | |
| Defendants, Cross-complainants, and Appellants. | |
| TNP 2008 PARTICIPATING NOTES PROGRAM, LLC, et al., | |
| Petitioners, Cross-respondents, and Appellants, | (Los Angeles County Super. Ct. No., BS152825) |
| v. | |
| MARK COHEN et al., | |
| Respondents, Cross-petitioners, and Appellants. | |

APPEALS from a judgment and orders of the Superior Court of Los Angeles County, Conrad R. Aragon and Michael L. Stern, Judges.  Reversed in part, affirmed in part, and remanded with directions.

Sitzer Law Group, Michael Ferdinand Sitzer, Stefanie Michelle Sitzer; Callahan & Blaine, Daniel J. Callahan, David J. Darnell and Stephanie A. Sperber for Defendants, Cross-complainants, and Appellants.

Gerard Fox Law, Gerard P. Fox and Marina V. Bogorad for Plaintiffs, Cross-defendants, and Respondents.

_____

## INTRODUCTION

An attorney who had recommended that his clients and his law firm's retirement plan invest in two real estate companies sought to arbitrate claims by his clients and the retirement plan against the companies, their parent company, and the parent company's chief executive officer.  Only the lawyer's clients, the retirement plan, and the two real estate companies signed the operative arbitration agreements.  After the two real estate companies agreed to arbitration, the trial court granted a petition to compel the nonsignatory parent company and its officer to arbitrate, and subsequently granted a petition to confirm the resulting arbitration award in favor of the attorney's clients.

To resolve the ensuing appeals and cross-appeals in this action, we hold (1) an attorney does not have standing to petition to compel arbitration of his clients' claims; (2) a signatory to an arbitration agreement can compel a nonsignatory parent company of a signatory subsidiary on an agency theory where (a) the parent controlled the subsidiary to such an extent that the

subsidiary was a mere agent or instrumentality of the parent and (b) the claims against the parent arose out of the agency relationship; (3) the arbitrator did not exceed his authority by substituting the attorney's clients as the real parties in interest in the arbitration; and (4) the arbitrator did not exceed his authority by denying attorneys' fees to a party that prevailed in the arbitration. The last holding requires us to part company with *DiMarco v. Chaney* (1995) 31 Cal.App.4th 1809 (*DiMarco*) and agree with *Safari Associates v. Superior Court* (2014) 231 Cal.App.4th 1400 (*Safari Associates*). In the end, we vacate the judgment and remand with directions for the trial court to enter new orders on the petition to compel arbitration and the cross-petitions to vacate and to correct the award. We also reverse the trial court's order denying attorneys' fees to the prevailing party in the postarbitration proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Investments*

In 2008 Thompson National Properties, LLC (TNP) created two subsidiary limited liability companies to raise funds from accredited investors for various real estate investments. The companies, TNP 2008 Participating Notes Program, LLC (the 2008 Program) and TNP 12% Notes Program, LLC (the 12% Program),[1] issued private placement memoranda offering investments through the sale of promissory notes. TNP, which held a 100 percent membership interest in each of the Programs,

---

[1] We refer to the 2008 Program and the 12% Program collectively as "the Programs," and to each as a "Program."

guaranteed the performance of the Programs' obligations under the notes, including the payment of principal and interest.

The Programs' private placement memoranda described the nature of the investments, the Programs' intended use of the money raised from the investments, various risk factors, and the procedures for accredited investors to invest in each Program. To participate, accredited investors completed and signed a subscription agreement included as an exhibit to the private placement memoranda, and upon payment and completion of other formalities, the investor received a promissory note. The promissory notes required the Programs to make monthly interest payments on the principal amount of the notes at a specified rate. The Programs agreed to pay each investor's principal and any unpaid interest in full on the notes' maturity dates. TNP pledged "all" of its (unspecified) membership interest in the Programs as collateral for its guaranty to repay the notes.

Mark Cohen, an investment advisor and attorney, recommended the Programs to his clients based on Cohen's prior business dealings with Anthony Thompson, the managing member and chief executive officer of TNP. More than 30 of Cohen's clients invested up to $200,000 each in one or both of the Programs. Cohen also invested his law firm's retirement plan, the Cohen & Burnett P.C. Profit Sharing 401(k) Plan (the Plan), of which Cohen served as trustee, in the 12% Program. Cohen did not personally invest in either Program, but he received fees and commissions for the investments by his clients and his firm's retirement plan.[2]

---

[2]     Cohen contended he received "only a part" of the commissions paid to Pacific West Securities, Inc., a "broker-

4

B.   *The Programs' Defaults and Cohen's Arbitration Demands*

The Programs defaulted on the promissory notes in 2012. On June 25, 2012 Thompson, acting in his capacity as CEO of TNP, sent a letter to noteholders in the 12% Program advising them the Program would defer all interest payments through the end of 2012 while TNP pursued "exciting new ventures" and hired an investment banking firm to raise additional capital for "significant transactions that would allow TNP to receive greater fee revenue." Neither the Programs nor TNP made payments on the notes after June 25, 2012.

On July 12, 2012 Cohen submitted two statements of claims and demands for arbitration to the American Arbitration Association (AAA) based on an arbitration provision in the subscription agreement for each Program. The arbitration provision stated: "I hereby covenant and agree that any dispute, controversy or other claim arising under, out of or relating to this Agreement or any of the transactions contemplated hereby, or any amendment thereof, or the breach or interpretation hereof or thereof, shall be determined and settled in binding arbitration in Los Angeles, California,[3] in accordance with applicable

---

dealer" that purchased the notes for Cohen's clients and for whom Cohen was a "registered representative." Cohen claimed he paid his portion of the commissions to another entity, which then "rebated the commissions" to Cohen's clients.

3      The subscription agreement for the 12% Program specified arbitration in Irvine, California. None of the parties involved in the eventual arbitration in Los Angeles appears to have demanded arbitration in Irvine.

California law, and with the rules and procedures of The American Arbitration Association." The subscription agreements were signed by investors in each Program and by an unidentified representative of TNP.[4]

Cohen's statement and demand against the 2008 Program identified the claimant as Cohen, "individually and as a representative of his client noteholders," and the respondents as the 2008 Program, TNP, and Thompson. The statement and demand against the 12% Program identified the claimants as the Plan and Cohen, "individually and as a representative of his client noteholders," and the respondents as the 12% Program, TNP, and Thompson. Cohen alleged the terms of TNP's guaranty gave "a third-party attorney or agent" the ability to bring an action to enforce the arbitration provision in the subscription agreements.[5] Both statements of claims alleged, among other things, breach of the promissory notes and TNP's guaranty, intentional misrepresentation, and breach of the implied covenant of good faith and fair dealing. The statements of claims

---

[4] The record does not include executed copies of the subscription agreements, but both Programs submitted to arbitration and apparently did not contest the existence of a valid arbitration agreement with each noteholder.

[5] The guaranty for each Program stated, in relevant part: "Guarantor acknowledges that the Noteholders may, by simple majority vote or consent, appoint one of them or a third-party attorney or agent, to prosecute the Noteholders' rights hereunder and such party shall be entitled to bring any suit, action or proceeding against the undersigned for the enforcement of any provision of this Guaranty on behalf of all Noteholders and it shall not be necessary in any such suit, action or proceeding to make each Noteholder a party thereto."

6

also alleged that Thompson was an alter ego of TNP and each Program and that TNP was "a sham company that does not have its own adequate capital or means of paying on the guaranty."

Both Programs agreed to arbitrate, but "decline[d] to submit to arbitration claims brought by [Cohen] in his representative capacity."  TNP and Thompson did not agree to arbitrate because neither had signed an arbitration agreement with Cohen or the noteholders.

C.    *The Petition To Compel Arbitration*

Cohen and the Plan filed a petition to compel arbitration against TNP and Thompson in the superior court.  They contended that "Petitioners and TNP are parties" to the 2008 Program and 12% Program private placement memoranda, even though Cohen did not invest in either Program and the Plan invested only in the 12% Program.  Cohen and the Plan requested an order enforcing the arbitration provision in the Programs' subscription agreements against TNP and Thompson because the arbitration claims were based on the respondents' collective breach of those agreements and TNP's guaranty and because Thompson was the alter ego of TNP and the Programs. To support their allegation that Thompson controlled the Programs, Cohen and the Plan submitted "official correspondence" sent to investors in the 12% Program signed by Thompson in his capacity as CEO of TNP.  Cohen and the Plan also argued that "litigating the controversy in multiple forums would be a colossal waste of judicial resources."

In response, TNP and Thompson argued Cohen and the Plan failed to show TNP or Thompson was a signatory to any arbitration agreement with Cohen or the Plan.  Indeed, TNP and

Thompson argued Cohen and the Plan had not provided a signed copy of any agreement, but had merely attached unsigned form agreements to the petition.  TNP and Thompson also argued that Cohen did not have standing to bring claims on behalf of his clients and that TNP's guaranty gave standing to represent investors only to a representative appointed or elected by a majority of the noteholders.  TNP and Thompson argued that, because Cohen's clients did not represent a majority of noteholders, the guaranty did not give Cohen standing to bring an action or proceeding on their behalf.  TNP and Thompson denied Thompson was an alter ego of TNP or the Programs and argued the limitation of liability provisions of the 2008 Program notes insulated Thompson from any obligation to arbitrate.

In reply, Cohen and the Plan argued for the first time that Cohen could enforce the arbitration agreement between his clients and the Programs because he was an agent for his clients. Cohen and the Plan cited *Westra v. Marcus & Millichap Real Estate Investment Brokerage Co., Inc.* (2005) 129 Cal.App.4th 759 (*Westra*), which held that "[a] nonsignatory to an agreement to arbitrate may be required to arbitrate, and may invoke arbitration against a party, if a preexisting confidential relationship, such as an agency relationship between the nonsignatory and one of the parties to the arbitration agreement, makes it equitable to impose the duty to arbitrate upon the nonsignatory." (*Id.* at p. 765.)  Cohen and the Plan argued "Cohen ha[d] the authority to act on his clients' behalf in the arbitrations with the [AAA] and in enforcing the arbitration agreements through the instant Petition to Compel Arbitration." They also asserted the Plan could enforce the arbitration agreements as a signatory to the subscription agreement for the

8

12% Program. Cohen and the Plan also argued for the first time on reply that TNP's guaranty required TNP to arbitrate. The guaranty required TNP to perform "all of the [Programs'] obligations" under the notes, which Cohen and the Plan interpreted to include the Program's "obligations" to arbitrate.

The trial court issued a tentative ruling that would have allowed Cohen to enforce the arbitration agreements between his clients and the Programs because Cohen was an agent for his clients. The tentative ruling also would have compelled TNP and Thompson to arbitrate because they were agents for the Programs.[6] At the hearing, counsel for TNP and Thompson argued Cohen and the Plan did not raise the argument that Cohen was an agent for his clients until the reply brief and had never, even in their reply brief, sought to compel TNP and Thompson to arbitrate as agents of the Programs.

Counsel for Cohen and the Plan argued that, because Cohen had acted as an agent for his clients for many years, "he had the authority, their explicit authority to bring this action." Counsel contended that Cohen and the Plan had "raised the law of agency" and "the law of alter ego" and that these were two of "many theories under which TNP and Mr. Thompson should be compelled to arbitrate." With regard to TNP, counsel for Cohen and the Plan argued the guaranty required TNP to participate in the arbitration. The court volunteered that "agency law probably bound Mr. Thompson." Counsel for TNP and Thompson said she

_____

[6] The tentative ruling is not included in the record on appeal, but the arguments by counsel at the hearing on the petition to compel and the court's ultimate ruling indicate the grounds on which the court based its tentative decision.

9

was not prepared to respond to that argument because Cohen and the Plan had not raised it in their pleadings. The court therefore granted TNP and Thompson leave to file a brief addressing why the court should not compel TNP and Thompson to arbitrate as agents of the Programs.

In their post-hearing brief, TNP and Thompson argued Cohen and the Plan had not presented evidence of an agency relationship between TNP or Thompson and the Programs. They acknowledged TNP and Thompson had authority to execute agreements on behalf of the Programs, but argued TNP and Thompson did not become liable for the Programs' obligations merely by signing documents on behalf of the Programs. TNP and Thompson distinguished *Westra*, *supra*, 129 Cal.App.4th 759 by arguing that, although the court there allowed a nonsignatory agent to enforce an arbitration agreement, the court did not compel a nonsignatory to arbitrate.

The trial court granted the petition. The court concluded it could not determine whether TNP and Thompson were alter egos of the Programs "on this record," but found they acted as agents for the Programs. In support of this ruling, the court found (1) Thompson "took a number of actions" on behalf of the Programs, including informing investors the 12% Program would not make interest payments for the remainder of 2012 and submitting to investors a proposed modification of the terms of the 12% Program; (2) Thompson, TNP, and the Programs were all affiliated entities because Thompson was TNP's Chief Executive Officer, TNP was the parent company of both Programs, and

10

Thompson was the managing member of both Programs;[7] and (3) TNP was the guarantor of both Programs' notes. The court ruled that, "[o]n these evidentiary facts," TNP and Thompson were "either agents or principals of the TNP parties to the arbitration agreement." The court also concluded Cohen had standing to bring the petition to compel because "a number of investors have appointed him to be their representative in claims against respondents."

D.    *The Arbitration Award*

The arbitration occurred in Los Angeles from March 31, 2014 to April 2, 2014. According to Cohen and the Plan, the parties stipulated to the amounts owed to each noteholder. The primary issues for the arbitrator were whether Thompson was an alter ego of TNP and the Programs, whether Cohen's role in recommending the investments to his clients affected his and his clients' rights to recover, and whether Cohen had standing to bring claims on behalf of his clients.

On July 14, 2014, after the arbitration hearing but before the award, Cohen, "individually and as a representative for Cohen & Burnett, P.C., a Virginia corporation, individually and as a representative of their client noteholders, and as a trustee for [the Plan]," along with Cohen's individual clients, filed with the arbitrator a document titled "Notice of Motion and Motion for Leave To File Amended Caption."[8] The motion sought to add as

---

[7]    The private placement memoranda identify Thompson as the managing member of TNP, not of the Programs.

[8]    It is unclear whether Cohen & Burnett, P.C. had been added as a claimant to the arbitration before the motion for leave

11

claimants to the pending arbitration all of Cohen's clients pursuant to Code of Civil Procedure sections 473 and 576,[9] which generally concern the substitution of parties and amendments to pleadings.  The moving parties argued that courts liberally grant motions for leave to amend and that adding Cohen's clients as claimants to the arbitration would not prejudice the Programs, TNP, or Thompson because they "have at all times acknowledged" the identities of Cohen's clients.  The motion stated:  "The individual client noteholders have all asserted and affirmed their agreement and belief that Mark Cohen and Cohen & Burnett, P.C. would represent their claims against Respondents in a suit against Respondents, and they have relied to their detriment on their belief that the language in the [private placement memoranda], and their signing of the Subscription Agreements, Powers of Attorney, and Affidavits, allowed for Mark Cohen and Cohen & Burnett, P.C. to represent their claims such that their names were not required on the pleading caption."[10]  The Programs, TNP, and Thompson opposed the motion.

---

to amend the caption.  The initial statements of claims and demands for arbitration identified only Cohen as a claimant in the demand against the 2008 Program and only Cohen and the Plan as claimants in the demand against the 12% Program.

[9]     Undesignated statutory references are to the Code of Civil Procedure.

[10]     Cohen submitted letters he sent on behalf of his firm to each of his clients with a subject matter line stating, "Re: Power of Attorney, Allocation, and Waiver of Conflicts Agreement."  The letters concluded with a signature block for the recipient below

12

The arbitrator issued his award on September 4, 2014. The arbitrator granted the motion to amend the caption to include Cohen's clients as the real parties in interest. The arbitrator found that neither Cohen, in his individual capacity, nor Cohen & Burnett, P.C. was a real party in interest, but did find that Cohen was a real party in interest as trustee of the Plan. The arbitrator also found that the Programs, TNP, and Thompson "have known all along the names and amounts invested by the real parties in interest . . . . Under the rules of the [AAA], the caption has been amended so that a just and equitable award can be made to the real parties in interest, and not their representatives nor to parties who have not invested in either [Program]."

The arbitrator rejected Cohen's argument that the guaranty gave him standing to bring claims on behalf of the investors. Instead, as argued by the Programs, TNP, and Thompson, the arbitrator concluded the guaranty allowed only a representative who represents a majority of all investors in the notes to bring a representative action. Thus, the arbitrator ruled, the powers Cohen received from his clients as their attorney "conferred on him the right to *oversee* litigation," but not "to *bring* litigation on their behalf as their representative."

The arbitrator ruled the Programs breached the terms of their contracts with the investors by defaulting on their obligations to make interest and principal payments under the notes. The arbitrator awarded Cohen's clients individual awards

the following statement: "I agree with the above terms and appoint Cohen & Burnett, P.C. as my Agent under the terms set out above, I agree to the settlement or judgment award allocation, and I waive any conflicts of interest involved in Cohen & Burnett, P.C. in acting as my Agent on this matter."

13

equal to the amounts unpaid under the notes plus interest. The arbitrator concluded, however, neither Cohen nor Cohen & Burnett, P.C. was entitled to an award, even though Cohen & Burnett, P.C. "advanced substantial fees for the litigation brought on behalf of Cohen's clients." The arbitrator also denied the Plan an award because "[i]t was not an innocently injured investor. It could not have relied upon misrepresentations made by Cohen, unlike Cohen's clients." The arbitrator stated the awards were "based on breach of contract, and no other cause of action."

The arbitrator also ruled TNP was liable for the amounts owed to Cohen's clients "because it guaranteed the Notes, and therefore breached its contractual obligations." The arbitrator also found Thompson was personally liable as an alter ego of the Programs and TNP. The arbitrator concluded: "Thompson moved substantial moneys between each of the Programs and numerous other entities controlled by him, and also between the Programs and his wife and him. . . . [T]he respondents failed to provide timely, sufficient accounting records to explain or justify the millions of dollars which were transferred in and out of the Programs at Thompson's sole discretion." The arbitrator also found "Thompson drained the Programs and their guarantor, TNP, of all funds necessary to fulfill their obligations under the Notes." Thus, "[t]o allow Thompson to render insolvent the Programs and their guarantor, TNP, in order to avoid their contractual obligations, would be an inequitable result."

The arbitration agreement for both Programs included a provision stating "[t]he prevailing party shall be entitled to an award of its reasonable costs and expenses, including, but not limited to, attorneys' fees, in addition to any other available

14

remedies."  The arbitrator concluded that the "attorneys' fees and costs paid by Cohen & Burnett, P.C. to the attorneys (Law Offices of Gerard Fox, Inc.) for Cohen's clients who invested in the Programs [were] reasonable."  The arbitrator nevertheless denied the clients' request for attorneys' fees and costs because "the attorneys' fees and costs were paid in advance by a party who is not a real party in interest as a claimant" and "were not paid by a prevailing party."  The arbitrator found Cohen, his firm, and the Plan were "not prevailing parties."  The arbitrator also found the attorneys' fees and costs "were advanced by a party whose founding partner, Cohen, was culpable for advising his clients to invest in the Programs."

With respect to Cohen, the arbitrator found "[i]f any fraudulent misrepresentations did occur, Cohen probably made them to his clients, assuring them that the investments were safe based solely on Thompson's record, rather than on the [private placement memoranda], which contained all the information upon which the investors were entitled to rely.  The [private placement memoranda] clearly show that the Programs involved Notes issued by new limited liability companies with no other assets, and that the Notes were guaranteed by TNP, a new entity with insufficient assets to meet its obligations under its guaranty once all the Notes were issued."  The arbitrator also suggested Cohen "promised to advance his clients' attorneys' fees and costs" to avoid legal action against himself for recommending "unsuitable investments to his clients," most of whom were over 70 years old and retired.  The arbitrator concluded that "[a]warding attorneys' fees and costs to the law firm whose founding partner is a culpable party, who profited from his mistaken advice, would be a gross injustice and violate the

15

equitable principle of unclean hands." The arbitrator directed that "[a]ll fees, expenses and compensation shall be borne equally by claimants (50%), jointly and severally, and by respondents (50%), jointly and severally."

      E.    *Postarbitration Proceedings*

The Programs, TNP, and Thompson filed a petition to vacate the arbitration award in the superior court. They argued the arbitrator exceeded his authority by issuing an award against nonsignatories TNP and Thompson, finding Thompson was an alter ego of TNP and the Programs, and permitting Cohen to litigate claims on behalf of his clients. Cohen, Cohen & Burnett, P.C., the Plan, and Cohen's clients (collectively, the Cohen Parties) filed three cross-petitions to "correct and confirm as corrected" the arbitration award. Two of the cross-petitions argued the arbitrator exceeded his authority by denying the prevailing parties attorneys' fees and by denying the Plan an award for the 12% Program's breach of contract. The third cross-petition argued the arbitrator made a mistake in the amount of the award for one investor.

The court denied the petitions to vacate and to correct the award (with the exception of correcting the award for the individual investor) and granted the petitions to confirm. In its statement of decision, the court ruled that "no grounds exist to correct the award as requested by cross-petitioners or vacate the award as requested by petitioners." The court entered judgment on July 1, 2015. The Cohen Parties filed a motion for attorneys' fees and costs incurred in connection with the petition to vacate and cross-petitions to correct and confirm the award. The court denied the motion.

16

The Programs, TNP, and Thompson filed a timely notice of appeal.  The Cohen Parties filed a timely notice of cross-appeal and an appeal from the order denying their motion for attorneys' fees and costs.  We consolidated the appeals.

## DISCUSSION

I.      *Cohen Did Not Have Standing To Bring the Petition To Compel Arbitration, and The Plan Had Standing Only for Its Claims Against the 12% Program*

A.      *Applicable Law and Standard of Review*

"'Standing' derives from the principle that '[e]very action must be prosecuted in the name of the real party in interest.'" (*City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 59; see § 367.)  ""'The real party in interest has "'an actual and substantial interest in the subject matter of the action,' and stands to be 'benefited or injured' by a judgment in the action."'" (*Turner v. Seterus, Inc.* (2018) 27 Cal.App.5th 516, 525; see *Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 54-55; *City of Santa Monica v. Stewart*, at pp. 59-60.)  ""'[A] plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'"" (*Airline Pilots Assn. Internat. v. United Airlines, Inc.* (2014) 223 Cal.App.4th 706, 726; see *City of Brentwood v. Campbell* (2015) 237 Cal.App.4th 488, 504 [the real party in interest "is the person who possesses the right to sue under the substantive law involved"].)

Someone who is not a party to a contractual arbitration provision generally lacks standing to enforce it.  (See *Ronay*

17

*Family Limited Partnership v. Tweed* (2013) 216 Cal.App.4th 830, 837 ["[t]he general rule is that only a party to an arbitration agreement may enforce it"]; *Smith v. Microskills San Diego L.P.* (2007) 153 Cal.App.4th 892, 896-900 (*Smith*) [nonsignatory to a promissory note containing an arbitration provision lacks standing to compel arbitration]; see generally *CAZA Drilling (California), Inc. v. TEG Oil & Gas U.S.A., Inc.* (2006) 142 Cal.App.4th 453, 465; *Jones v. Aetna Casualty & Surety Co.* (1994) 26 Cal.App.4th 1717, 1722.)  Third parties may enforce a contract with an arbitration provision, however, where they are intended third party beneficiaries or are assigned rights under the contract.  (*Smith*, at pp. 898-900; see *Goonewardene v. ADP, LLC* (2016) 5 Cal.App.5th 154, 171-172 [third party beneficiary], review granted Feb. 15, 2017, S238941; *Applera Corp. v. MP Biomedicals, LLC* (2009) 173 Cal.App.4th 769, 786-787 [assignee].)  Third parties may also have standing to enforce a contract without joining as parties the persons for whose benefit the action is prosecuted where the plaintiff is a personal representative as defined in the Probate Code, a trustee of an express trust, or any other person "expressly authorized by statute."  (§ 369, subd. (a).)

The rules are the same for third parties who are agents of a party to a contract.  "[A]n agent for a party to a contract not made with or in the name of the agent is not a real party in interest with standing to sue on the contract."  (*Powers v. Ashton* (1975) 45 Cal.App.3d 783, 789; see *Epic Communications, Inc. v. Richwave Technology, Inc.* (2009) 179 Cal.App.4th 314, 334 [agents ordinarily do not have "a cause of action based upon some third person's violation of its principal's rights," and "[w]ithout some breach of a duty owed *to him,* [the agent] has no power to

sue on the principal's claim"].)  An agent acting on behalf of a principal might have standing to sue, however, if the agent "has some beneficial interest in the subject matter."  (4 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 141, p. 209.)  For example, an agent has standing to sue where a contract creates obligations for the agent as a fiduciary to the principal.  (*Ibid.*; see *Walter J. Warren Ins. Agency v. Surpur Timber Co.* (1967) 250 Cal.App.2d 99, 104.)

We review de novo the trial court's determination that Cohen (and impliedly, the Plan) had standing to enforce the arbitration agreements.  (*M & M Foods, Inc. v. Pacific American Fish Co., Inc.* (2011) 196 Cal.App.4th 554, 559; see *Smith*, *supra*, 153 Cal.App.4th at p. 896 [reviewing de novo a trial court's determinations on standing to compel arbitration].)

B.  *Cohen Did Not Have Standing To Compel Arbitration as an Agent of His Clients*

Cohen concedes that he did not hold a note issued or sold by either Program and that he was not a party to either Program's subscription agreement.  Cohen does not argue he had any personal legal interests or rights under the subscription agreements, and he and his firm (perplexingly) admitted neither of them has ever been a party to this case.  And as trustee of the Plan, Cohen concedes the Plan invested only in the 12% Program. Yet Cohen asserts he had standing to petition the court to compel TNP and Thompson to arbitrate because he had an agency relationship with his clients, on whose behalf he contends he brought the petition.

TNP and Thompson contend the fact that Cohen's clients appointed him to be their representative did not give Cohen

19

standing to compel TNP and Thompson to arbitrate.  TNP and Thompson also contend the Plan lacked standing to compel them to arbitrate disputes arising from the 2008 Program because the Plan invested only in the 12% Program.  TNP and Thompson are right on both counts.

Even if Cohen acted as an agent for his clients, he did not have standing to bring a "representative petition" to compel arbitration on their behalf.  Cohen was not a party to the subscription agreements, nor does he identify any substantial, personal interest in the agreements.  He does not claim to be a third party beneficiary, his clients did not assign him the notes or any of their rights under the subscription agreements, and he identifies no statute giving him standing to enforce the subscription agreements on behalf of his clients.  He was perhaps an attorney-in-fact or an investment manager, neither of which gave him standing to enforce the agreements.  (See *JSM Tuscany, LLC v. Superior Court* (2011) 193 Cal.App.4th 1222, 1240, fn. 20 ["when a nonsignatory of a contract is attempting to seek relief for breach of the contract itself, that nonsignatory *must* be doing so by means of either a third-party beneficiary argument, or a legal theory which entitles that nonsignatory to 'stand in the shoes' of a party to the agreement—either by virtue of a preexisting relationship, or as an assignee or successor in interest"]; *Northstar Financial Advisors, Inc. v. Schwab Investments* (N.D.Cal. 2009) 609 F.Supp.2d 938, 942 [investment manager could not "bring claims on behalf of its clients simply by virtue of its status as an investment advisor"], revd. on another ground (9th Cir. 2010) 615 F.3d 1106.)

Cohen appears to conflate standing to enforce an arbitration agreement with the enforceability of an arbitration

agreement by or against a nonsignatory. As discussed in part II, in some circumstances California law allows nonsignatory agents of a party to an arbitration agreement to enforce that agreement, and in other circumstances it requires nonsignatory agents of contracting parties to submit to arbitration. That does not suggest, however, that an agent who is not a third party beneficiary of an arbitration agreement and who does not have any actual and substantial interest in the agreement has standing to enforce it. Although standing is "closely connected . . . to the ultimate determination whether to compel arbitration," standing is still a preliminary requirement for justiciability. (*Bouton v. USAA Casualty Ins. Co.* (2008) 167 Cal.App.4th 412, 425; see *M & M Foods, Inc. v. Pacific American Fish Co., Inc.*, *supra*, 196 Cal.App.4th at pp. 560-561.) Because Cohen lacked standing to enforce the arbitration agreements, we reverse the trial court's order compelling TNP and Thompson to arbitrate Cohen's claims against them.

As stated, however, while the Plan did not invest in the 2008 Program, it did invest in the 12% Program. Therefore, the Plan had standing to petition to compel TNP and Thompson to arbitrate its claims relating to that Program.[11] Thus, we must consider whether the trial court erred in granting the Plan's petition to compel TNP and Thompson to arbitrate the Plan's claims against them relating to the 12% Program.

---

[11] TNP and Thompson do not challenge the existence of an arbitration agreement between the Plan and the 12% Program.

II.     *The Trial Court Properly Granted the Plan's Petition To Compel TNP To Arbitrate, but Erred in Granting the Plan's Petition to Compel Thompson To Arbitrate*

A.     *Applicable Law and Standard of Review*

"A party to an arbitration agreement may petition the court to compel other parties to arbitrate a dispute that is covered by their agreement." (*Jones v. Jacobson* (2011) 195 Cal.App.4th 1, 15; § 1281.2.) "California has a strong public policy in favor of arbitration as an expeditious and cost-effective way of resolving disputes." (*Avila v. Southern California Specialty Care, Inc.* (2018) 20 Cal.App.5th 835, 843 (*Avila*); see *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9 (*Moncharsh*).) "Even so, parties can only be compelled to arbitrate when they have agreed to do so. [Citation.] 'Arbitration . . . is a matter of consent, not coercion.'" (*Avila*, at p. 843; see *Suh v. Superior Court* (2010) 181 Cal.App.4th 1504, 1512 (*Suh*) ["'[e]ven the strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement or who have not authorized anyone to act for them in executing such an agreement'"].)

"Whether an agreement to arbitrate exists is a threshold issue of contract formation and state contract law." (*Avila*, *supra*, 20 Cal.App.5th at p. 843; see *DMS Services, LLC v. Superior Court* (2012) 205 Cal.App.4th 1346, 1353, fn. 3 ["the question whether a contract containing an arbitration provision can be enforced by or against nonparties to the contract is governed by state law principles"].) "The party seeking to compel arbitration bears the burden of proving the existence of a valid arbitration agreement." (*Avila*, at p. 844; accord, *Espejo v.*

22

*Southern California Permanente Medical Group* (2016) 246 Cal.App.4th 1047, 1057.)

"'Whether an arbitration agreement is binding on a third party (e.g., a nonsignatory) is a question of law subject to de novo review.'" (*Benaroya v. Willis* (2018) 23 Cal.App.5th 462, 468; see *Suh*, *supra*, 181 Cal.App.4th at p. 1512.)  Nevertheless, we presume the court found every fact and drew every permissible inference necessary to support its judgment or order, and we defer to the court's determination of credibility of the witnesses and weight of the evidence in resolving disputed facts.  (*Jones v. Jacobson*, *supra*, 195 Cal.App.4th at p. 12.)  "[I]f there are material facts in dispute, we must accept the trial court's resolution of such disputed facts when supported by substantial evidence." (*Ibid.*; accord, *Suh*, at p. 1511.)

> B.     *A Signatory Can Sometimes Compel a Nonsignatory To Arbitrate as an Agent or Principal of a Signatory*

"'There are circumstances in which nonsignatories to an agreement containing an arbitration clause can be compelled to arbitrate under that agreement.  As one authority has stated, there are six theories by which a nonsignatory may be bound to arbitrate: "(a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing or alter ego; (e) estoppel; and (f) third-party beneficiary."'" (*Benaroya v. Willis*, *supra*, 23 Cal.App.5th at p. 469; accord, *Suh*, *supra*, 181 Cal.App.4th at p. 1513.)  The trial court concluded TNP and Thompson were bound by the arbitration provision in the subscription agreements as "agents or principals" of the Programs.

Not every agency relationship, however, will bind a nonsignatory to an arbitration agreement.  (See *Jensen v. U-Haul*

23

*Co. of California* (2017) 18 Cal.App.5th 295, 304-305 (*Jensen*) [rejecting the argument that an "agency relationship alone gives the signatory the authority to bind the nonsignatory"].) "Every California case finding nonsignatories to be bound to arbitrate is based on facts that demonstrate, in one way or another, the signatory's implicit authority to act on behalf of the nonsignatory." (*Id.* at p. 304; see *County of Contra Costa v. Kaiser Foundation Health Plan, Inc.* (1996) 47 Cal.App.4th 237, 243 ["[a]ll nonsignatory arbitration cases are grounded in the authority of the signatory to contract . . . on behalf of the nonsignatory—to bind the nonsignatory in some manner"].) Courts also have stated that the agency relationship between the nonsignatory and the signatory must make it "'equitable to compel the nonsignatory'" to arbitrate. (*Jensen*, at p. 301; see *Matthau v. Superior Court* (2007) 151 Cal.App.4th 593, 599; *Westra, supra*, 129 Cal.App.4th at p. 765; *NORCAL Mutual Ins. Co. v. Newton* (2000) 84 Cal.App.4th 64, 76; *County of Contra Costa v. Kaiser Foundation Health Plan, Inc., supra*, 47 Cal.App.4th at p. 243.)

But equity, without more, is not enough. (*Jensen, supra*, 18 Cal.App.5th at p. 304.) Courts must also ask "who is seeking to bind whom, and on what basis." (*Id.* at p. 303.) "[T]he question of whether a principal's acts bind an agent is fundamentally different from the question of whether an agent's acts bind a principal." (*Ibid*.) Courts look to traditional principles of contract and agency law to determine whether a nonsignatory is bound by an arbitration agreement signed by its principal or agent. (*Avila, supra*, 20 Cal.App.5th at pp. 843-845; *Comer v. Micor, Inc.* (9th Cir. 2006) 436 F.3d 1098, 1101; see 21 Williston on Contracts § 57:19, p. 183 (4th ed. 2001) ["a nonsignatory may

24

acquire rights under or be bound by an arbitration agreement if so dictated by the ordinary principles of contract and agency," fns. omitted].)

### 1. *Principals Binding Agents*

An agency relationship between an employer or company (the principal) and its individual employee or officer (the agent) does not normally bind the individual to an arbitration agreement entered into by the employer or company. "Persons are not normally bound by an agreement entered into by a corporation in which they have an interest or are employees." (*Suh*, *supra*, 181 Cal.App.4th at p. 1513; see *Jensen*, *supra*, 18 Cal.App.5th at p. 304.) For example, in *Jensen* the employee of a transport company sued a rental truck company for negligence after the truck he was driving blew a tire. (*Jensen*, at p. 298.) The driver's supervisor had signed a rental contract with the rental truck company that included an arbitration provision requiring arbitration of all claims between the rental truck company and the transport company, its agents, and employees. (*Id.* at p. 299.) Despite the agency relationship between the employee driver and his employer, the court applied the general rule and held the driver's company's agreement did not bind the driver personally. (*Id.* at p. 304.)

Similarly, courts generally do not compel corporate officers and directors to arbitrate claims arising from contracts signed in their representative capacities. (See *Benasra v. Marciano* (2001) 92 Cal.App.4th 987, 991; *Covington v. Aban Offshore Limited* (5th Cir. 2011) 650 F.3d 556, 561; *Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.* (3d Cir. 1999) 181 F.3d 435, 445-446.) In such cases, even if the officers and directors acted as agents for the entities

they represented, under ordinary rules of contract and agency law a representative who unambiguously signs a contract as a corporate officer or agent is not a party to the contract in his or her personal capacity. (*Ronay Family Limited Partnership v. Tweed*, *supra*, 216 Cal.App.4th at pp. 837-838; *Benasra v. Marciano*, at p. 990; see Cal. U. Com. Code, § 3402, subd. (b).)

There are exceptions to the general rule. For example, courts have compelled nonsignatory officers and employees to arbitrate claims alleged against them in their individual capacities even if they did not sign an arbitration agreement, or signed only as representatives of their employers or principals, where the officer or employee personally benefitted from the underlying contract. (See, e.g., *RN Solution, Inc. v. Catholic Healthcare West* (2008) 165 Cal.App.4th 1511, 1520 (*RN Solution*) [corporate officer "benefited financially and professionally" from an agreement that included an arbitration provision]; *Harris v. Superior Court* (1986) 188 Cal.App.3d 475, 479 (*Harris*) [arbitration clause in a contract between patients and their health services program bound a doctor who voluntarily accepted patients from the plan].)[12]

---

[12] These courts distinguish this application of the agency exception to the general rule that only a party to an arbitration agreement may be compelled to arbitrate from the exception for third party beneficiaries. (See *RN Solution*, at p. 1520 [officer employee of corporation who signed arbitration agreement in her representative capacity was bound by the agreement "both as an agent-employee . . . and as a third party beneficiary"]; *Harris*, at p. 479 [doctor's "voluntary acceptance of the benefit of a transaction" provided an additional basis on which to compel him to arbitrate].)

26

2.     *Agents Binding Principals*

The opposite issue, whether an arbitration agreement signed by an agent also binds the agent's nonsignatory principal, is less commonly litigated.  And cases involving a subsidiary company allegedly signing an arbitration agreement as the agent for its parent company are rare.  In general, a parent company is not liable on a contract signed by its subsidiary "simply because it is a wholly owned subsidiary." (*Northern Natural Gas Co. v. Superior Court* (1976) 64 Cal.App.3d 983, 991; see also *Curci Investments, LLC v. Baldwin* (2017) 14 Cal.App.5th 214, 220 ["[o]rdinarily a [limited liability company] is considered a separate legal entity, distinct from . . . its members and managers"].)  "Some other basis of liability must be established." (*Northern Natural Gas Co. v. Superior Court*, at p. 991.)  Agency is one such other basis of liability.  (See *Agricola Baja Best, S. De. R.L. de C.V. v. Harris Moran Seed Co.* (S.D.Cal. 2014) 44 F.Supp.3d 974, 982 [applying California law]; *Wallis v. Centennial Ins. Co., Inc.* (E.D.Cal. 2013) 927 F.Supp.2d 909, 915-916 [same].)

In a parent-subsidiary relationship, the agency doctrine may bind a parent to the contracts of its subsidiary where, in addition to owning the subsidiary, the parent company exercises "sufficient control over the [subsidiary's] activities" such that the subsidiary becomes a "mere agen[t] or 'instrumentality' of the parent." (9 Witkin, Summary of Cal. Law (11th ed. 2017) Corporations, § 19, p. 821; see *Laird v. Capital Cities/ABC, Inc.* (1998) 68 Cal.App.4th 727, 741 (*Laird*) [to hold a parent corporation liable for acts or omissions of its subsidiary on an agency theory, the plaintiff must show "'a parent corporation

27

*so controls the subsidiary* as to cause the subsidiary to become *merely* the agent or instrumentality of the parent"], disapproved on another ground by *Reid v. Google* (2010) 50 Cal.4th 512; *Ruhnke v. SkinMedica, Inc.* (C.D.Cal., Sept. 5, 2014, No. SACV 14-0420-DOC (JPRx)) 2014 WL 12577172, at p. 10 (*Ruhnke*) [applying California law and observing that an agency relationship may make a parent liable for contracts of its subsidiary where "'the nature and extent of the control exercised over the subsidiary by the parent' [is] 'so pervasive and continual that the subsidiary may be considered nothing more than an agent or instrumentality of the parent'"]; cf. *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 541 (*Sonora Diamond*) [agency relationship between foreign parent and domestic subsidiary may confer general jurisdiction over the parent in the forum state].)  "'The nature of the control exercised by the parent over the subsidiary . . . must be over and above that to be expected as an incident of the parent's ownership of the subsidiary and must reflect the parent's purposeful disregard of the subsidiary's independent corporate existence.'" (*Ruhnke*, at p. 10; see 9 Witkin, Summary of Cal. Law, *supra*, Corporations § 19, p. 821; see also *Sonora Diamond*, at pp. 541-542; ["if a parent corporation exercises such a degree of control over its subsidiary corporation that the subsidiary can legitimately be described as only a means through which the parent acts, or nothing more than an incorporated department of the parent, the subsidiary will be deemed to be the agent of the parent in the forum state," but "[a]s a practical matter, the parent must be shown to have moved beyond the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's *day-to-day* operations in carrying

28

out that policy"];[13] *Dougherty v. Bank of America, N.A.* (E.D.Cal. 2016) 177 F.Supp.3d 1230, 1254 [under California law, a principal-agent relationship exists if "the principal has a right to control the day-to-day conduct of the agent"].)

One of the few cases in which a party sought to bind a nonsignatory parent of a signatory subsidiary to an arbitration agreement on an agency theory (and we found no such published cases in California) is *E.I. DuPont de Nemours v. Rhone Poulenc Fiber* (3d Cir. 2001) 269 F.3d 187 (*DuPont*). In that case the court held a nonsignatory parent could be compelled to arbitrate based on an arbitration agreement signed by its subsidiary where the subsidiary acted as an agent for the parent and the cause of action arose out of that relationship. (*Id.* at p. 198; see *id.* at p. 199 [citing dicta in *J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A.* (4th Cir. 1988) 863 F.2d 315 for the proposition that "a court 'may' refer claims against a non-signatory parent to arbitration when the claims against the parent and the subsidiary are 'based on the same facts and are inherently inseparable'"].) The court in *DuPont* applied Delaware law and held, "'Unlike the alter

---

[13] The court in *Sonora Diamond* distinguished the agency theory of liability from the alter ego theory by explaining that "the question is not whether there exists justification to disregard the subsidiary's corporate identity, the point of the alter ego analysis, but instead whether the degree of control exerted over the subsidiary by the parent is enough to reasonably deem the subsidiary an agent of the parent under traditional agency principles." (*Sonora Diamond*, *supra*, 83 Cal.App.4th at p. 541; see *Bowoto v. Chevron Texaco Corp.* (N.D.Cal. 2004) 312 F.Supp.2d 1229, 1238 ["[u]nlike liability under the alter-ego or veil-piercing test, agency liability does not require the court to disregard the corporate form"].)

29

ego/piercing the corporate veil theory, when customary agency is alleged [as a basis for binding a parent to a contract of its subsidiary] the proponent must demonstrate a relationship between the corporation and the cause of action. Not only must an arrangement exist between the two corporations so that one acts on behalf of the other and within usual agency principles, but the arrangement must be relevant to the plaintiff's claim of wrongdoing.'" (*Dupont*, at p. 198; accord, *InterGen N.V. v. Grina* (1st Cir. 2003) 344 F.3d 134, 148; *Siopes v. Kaiser Foundation Health Plan, Inc.* (2013) 130 Hawai'i 437, 454; 21 Williston on Contracts, *supra*, § 57:19, p. 183.) The court in *DuPont* concluded that, because the party seeking to compel arbitration did not show the cause of action related to the agency relationship between the parent and its subsidiary that entered into the contract containing an arbitration agreement, the court would not compel the parent to arbitrate a claim arising from the underlying contract. (*DuPont*, at p. 199.)

Similarly, California law permits a nonsignatory defendant to compel a signatory plaintiff to arbitrate where there is a connection between the claims alleged against the nonsignatory and its agency relationship with a signatory. (See *Dryer v. Los Angeles Rams* (1985) 40 Cal.3d 406, 418 [nonsignatory agents were entitled to enforce a contract's arbitration provision where the plaintiff sued them in their capacities as agents for the signatory and the significant issues in the dispute arose out of the contractual relationship between the parties]; *Fuentes v. TMCSF, Inc.* (2018) 26 Cal.App.5th 541, 551 [nonsignatory was not entitled to compel a signatory plaintiff to arbitrate a dispute unrelated to the nonsignatory's agency relationship with a signatory]; *Smith*, *supra*, 153 Cal.App.4th at p. 897 [same]; see

also *Britton v. Co-op Banking Group* (9th Cir. 1993) 4 F.3d 742, 743 [owner-agent of the defendant corporation could not enforce the arbitration clause of a contract signed only by the corporation because "none of his allegedly wrongful acts arose out of or were related to the contract"]; Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2017) ¶ 5.266.5, p. 5-274 [nonsignatories can enforce an arbitration agreement where the claims against the nonsignatory "aris[e] under the contract" containing an arbitration provision, "but not other claims," italics omitted].)[14]  A connection between the causes of action alleged against the nonsignatory and that party's agency relationship to a signatory makes it equitable to allow the nonsignatory to enforce the arbitration provision against a signatory plaintiff.  (See *County of Contra Costa v. Kaiser Foundation Health Plan, Inc.*, *supra*, 47 Cal.App.4th at p. 243; *Matthau v. Superior Court*, *supra,* 151 Cal.App.4th at p. 599.)

As *DuPont* acknowledges, this connection may also make it equitable for a signatory to compel a nonsignatory to arbitrate so long as another signatory had authority to bind the nonsignatory to the arbitration agreement.  (See *DuPont*, *supra*, 269 F.3d at

---

[14]    Where a nonsignatory relies on the estoppel exception to invoke an arbitration agreement, courts generally ask whether ""the causes of action against the nonsignatory are 'intimately founded in and intertwined' with the underlying contract obligations.""" (*DMS Services, LLC v. Superior Court*, *supra*, 205 Cal.App.4th at p. 1354; accord, *Garcia v. Pexco, LLC* (2017) 11 Cal.App.5th 782, 786.)  California courts have not applied the same standard when considering whether to compel a nonsignatory to arbitrate under the agency exception.  And this case does not involve the estoppel exception.

31

p. 198.) The requirements for imposing arbitration on a nonsignatory principal, as opposed to allowing a nonsignatory agent to compel arbitration, however, must be "exacting." (*InterGen N.V. v. Grina, supra,* 344 F.3d at p. 148; 21 Williston on Contracts, *supra,* § 57:19, p. 183; see *Benasra v. Marciano, supra,* 92 Cal.App.4th at p. 991 ["[i]t is one thing to permit a nonsignatory to relinquish his right to a jury trial, but quite another to compel him to do so"]; *DK Joint Venture 1 v. Weyand* (5th Cir. 2011) 649 F.3d 310, 316 ["'it matters whether the party resisting arbitration is a signatory or not'"]; *Merrill Lynch Inv. Managers v. Optibase, Ltd.* (2d Cir. 2003) 337 F.3d 125, 131 [same].) Therefore, we adopt the standard in *DuPont* to determine whether a party to an arbitration agreement can compel a nonsignatory parent of a signatory subsidiary to arbitrate under the agency exception. We emphasize, however, that an arbitration agreement signed by a subsidiary may bind the parent company only where the party seeking to compel arbitration can show the parent had sufficient control over the subsidiary's activities such that the subsidiary was a mere agent or instrumentality of the parent *and* the causes of action or claims against the parent arise out of this relationship.

C. *The Trial Court Properly Compelled TNP To Arbitrate*

The trial court found TNP acted as an agent or principal of the Programs (although the court did not say which one). The court ruled that, in either case, TNP was "clearly in a principal/agency relationship" with the Programs and was their guarantor. TNP challenges the trial court's order compelling it to arbitrate based on its agency relationship with the Programs, but

32

it does not challenge the court's factual finding that an agency relationship existed with the Programs.  (See *Secci v. United Independent Taxi Drivers, Inc.* (2017) 8 Cal.App.5th 846, 854 [""'"[t]he existence of an agency is a factual question within the province of the trier of fact whose determination may not be disturbed on appeal if supported by substantial evidence""'"].)  The trial court did not distinguish between the two Programs for purposes of assessing TNP's agency relationship with them, and TNP conceded at oral argument that it was equally involved with each Program.  However, because only the Plan had standing to petition TNP to arbitrate and the Plan invested only in the 12% Program, we limit our analysis to whether TNP's agency relationship with the 12% Program was sufficient to compel TNP to arbitrate under that Program's subscription agreement.  We conclude the trial court properly compelled TNP to arbitrate, but only in connection with claims alleged by the Plan.

TNP acted as the 12% Program's agent by signing the subscription agreement as the "Managing Member."  As stated, however, this action, without more, was not enough to bind TNP to the arbitration agreement.  (See *Jensen*, *supra*, 18 Cal.App.5th at pp. 304-305.)  But the record also shows TNP was the parent company of the 12% Program (because TNP owned it) and exercised sufficient control over the 12% Program to cause it to become "'merely the agent or instrumentality'" of TNP.  (*Laird*, *supra*, 68 Cal.App.4th at p. 741, italics omitted.)  After the 12% Program defaulted on the promissory notes in 2012, TNP sent a letter dated June 25, 2012 on its letterhead to the 12% Program noteholders that substantially blurred the lines between the two entities and held out TNP to the noteholders as more than just parent, managing member, and guarantor of the Program.  The

letter stated TNP "formed" the 12% Program and "is also the guarantor on the notes." The letter continued: "We are informing you that we will need to defer all interest payments through the end of 2012. TNP understands that this is not the answer you want to hear, but we want you to know that we fully intend to pay to you any remaining interest and principal on or prior to the maturity date of June 10, 2013. We are doing everything we can to make this happen." (Emphasis omitted.) The letter invited noteholders to contact TNP employees and officers with any questions. TNP's direct communications with the 12% Program noteholders went beyond its role as guarantor and managing member and showed that TNP, as the 12% Program's parent, controlled the Program's day-to-day operations. The record also includes evidence that the entities shared the same address and phone number.

The claims alleged against TNP arose directly from its agency relationship with the 12% Program and were well within the scope of the arbitration provision in the subscription agreement. Indeed, the arbitration provision required arbitration of any claim "arising under, out of or relating to this Agreement or any of the transactions contemplated hereby," including, for example, TNP's obligations as guarantor. The guaranty, like the subscription agreement, was an exhibit to the private placement memorandum, thus making the guaranty a "transaction[ ] contemplated" by the subscription agreement. And the claims alleged against TNP were "'based on the same facts and are inherently inseparable'" from the claims alleged against the 12% Program. (*DuPont*, *supra*, 269 F.3d at p. 199.) Therefore, because the 12% Program acted as a mere agent or instrumentality of its parent company TNP, and the

34

12% Program noteholders' claims arose out of the relationship between TNP and the Program, TNP is bound by the arbitration provision in the 12% Program's subscription agreement.

> D. *The Trial Court Erred in Compelling Thompson To Arbitrate*

The trial court also found Thompson was bound by the arbitration provision of the subscription agreement because he was "in a principal/agency relationship" with the Programs. As with TNP, Thompson does not contend substantial evidence does not support the trial court's agency finding. Instead, he argues his agency does not bind him to the arbitration agreement. And he is correct. There was no evidence suggesting the general rule, that a representative who signs a contract as a corporate officer or agent is not a party to the contract in his or her personal capacity, did not apply to Thompson. (See *Ronay Family Limited Partnership v. Tweed, supra*, 216 Cal.App.4th at pp. 837-838; *Benasra v. Marciano, supra*, 92 Cal.App.4th at p. 990.)

The Plan argues it can compel Thompson to arbitrate either because he was an agent of the 12% Program who "accepted the benefits" of the notes or because he was a third party beneficiary of the notes. As evidence of the "benefits" Thompson received, the Plan cites the arbitration award, in which the arbitrator found "Thompson drained the Programs and their guarantor, TNP, of all funds necessary to fulfill their obligations under the Notes."[15] The evidence supporting the arbitrator's finding,

---

[15] The Plan did not present any evidence showing Thompson was an intended third party beneficiary of the notes or of any agreement between the noteholders and the 12% Program.

35

however, was not before the trial court when the Plan petitioned to compel Thompson to arbitrate. Indeed, the Plan did not seek to compel Thompson to arbitrate as an agent who benefitted from the notes or as a third party beneficiary of them. While we can affirm the trial court's order compelling Thompson to arbitrate on any theory supported by the record (*Mayflower Ins. Co. v. Pellegrino* (1989) 212 Cal.App.3d 1326, 1332), the record before the trial court on the petition to compel did not contain any evidence Thompson benefited from the notes by "draining" the Programs of their funds. "[T]he trial court can base its decision only on the material before it, and those materials circumscribe our review of the trial court's decision as well." (*Valentine Capital Asset Management, Inc. v. Agahi* (2009) 174 Cal.App.4th 606, 619; see *id.* at p. 618, fn. 9 [rejecting new factual assertions as a basis to reverse the trial court's order denying a motion to compel arbitration where the assertions were not "contained in the pleadings or the evidence presented in support of or in opposition to the motion to compel arbitration" in the trial court].)[16] Because Thompson was not a party to the 12%

---

[16] Because we conclude the Plan could not compel Thompson to arbitrate, we do not address Thompson's argument that the arbitrator exceeded his authority by making him personally liable for the arbitration award as an alter ego of the Programs and TNP. Although we vacate the order confirming the arbitration award to the extent it applies to Thompson, nothing in this opinion affects the clients' ability to ask the trial court to add Thompson as a judgment debtor as the alter ego of the Programs and TNP. (See *Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 507-508 [section 187 authorizes a trial court to amend a judgment to add additional judgment debtors]; *Hall,*

Program's subscription agreement, and the Plan failed to show Thompson could be compelled to arbitrate as a nonsignatory, the trial court erred by compelling Thompson to arbitrate the Plan's claims against him.

III.   *The Trial Court Properly Confirmed the Arbitration Award*

The trial court's order confirming the arbitration award and denying the petitions to vacate made TNP and Thompson liable for the arbitration awards against both Programs.  Because we reverse the court's orders compelling Thompson to arbitrate all claims alleged against him and compelling TNP to arbitrate claims alleged by Cohen regarding the 2008 Program, our review of the trial court's order granting the petition to confirm and denying the petitions to vacate is limited to (1) the claims alleged by the Plan against the 12% Program and TNP and (2) the claims alleged by Cohen's clients (added as claimants by the arbitrator) against both Programs and against TNP with regard to the 12% Program only.  All parties contend the arbitrator exceeded his authority in one way or another.

A.   *Applicable Law and Standard of Review*

"The legal standards governing judicial review of arbitration awards are well established."  (*Sargon Enterprises, Inc. v. Browne George Ross LLP* (2017) 15 Cal.App.5th 749, 763.)

---

*Goodhue, Haisley & Barker, Inc. v. Marconi Conf. Center Bd.* (1996) 41 Cal.App.4th 1551, 1555 ["[j]udgments may be amended to add additional judgment debtors on the ground that a person or entity is the alter ego of the original judgment debtor"].)

"California law favors alternative dispute resolution as a viable means of resolving legal conflicts. 'Because the decision to arbitrate grievances evinces the parties' intent to bypass the judicial system and thus avoid potential delays at the trial and appellate levels, arbitral finality is a core component of the parties' agreement to submit to arbitration.' [Citation.] Generally, courts cannot review arbitration awards for errors of fact or law, even when those errors appear on the face of the award or cause substantial injustice to the parties." (*Richey v. AutoNation, Inc.* (2015) 60 Cal.4th 909, 916 (*Richey*); see *Moncharsh, supra,* 3 Cal.4th at p. 10.)

The California Arbitration Act (§ 1280 et seq.) provides limited grounds for judicial review of an arbitration award. Courts are authorized to vacate an award if it was "(1) procured by corruption, fraud, or undue means; (2) issued by a corrupt arbitrator; (3) affected by prejudicial misconduct on the part of the arbitrator; or (4) in excess of the arbitrator's powers." (*Richey, supra,* 60 Cal.4th at p. 916; see § 1286.2, subd. (a).) Section 1286.2 provides that "a court *shall* vacate an award if it determines '[t]he arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted.'" (*O'Flaherty v. Belgum* (2004) 115 Cal.App.4th 1044, 1055; see § 1286.2, subd. (a)(4); *Moncharsh, supra,* 3 Cal.4th at p. 12.) The court may correct, as opposed to vacate, an award where "[t]here was an evident miscalculation of figures or an evident mistake," "[t]he arbitrators exceeded their powers but the award may be corrected without affecting the merits of the decision," or "[t]he award is imperfect in a matter of form, not affecting the merits of the controversy." (§ 1286.6; see *Richey,* at p. 916.)

Arbitrators may exceed their powers when they act in a manner not authorized by the contract or by law, act without subject matter jurisdiction, decide an issue that was not submitted to arbitration, arbitrarily remake the contract, uphold an illegal contract, issue an award that violates a well-defined public policy, issue an award that violates a statutory right, fashion a remedy that is not rationally related to the contract, or select a remedy not authorized by law. (*O'Flaherty v. Belgum*, *supra*, 115 Cal.App.4th at pp. 1055-1056; *Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 443.) However, "'"[a]rbitrators do not ordinarily exceed their contractually created powers simply by reaching an erroneous conclusion on a contested issue of law or fact, and arbitral awards may not ordinarily be vacated because of such error."'" (*Richey*, *supra*, 60 Cal.4th at pp. 916-917; see *Sargon Enterprises, Inc. v. Browne George Ross LLP*, *supra*, 15 Cal.App.5th at p. 763.)

"'"In determining whether an arbitrator exceeded his [or her] powers, we review the trial court's decision de novo, but we must give substantial deference to the arbitrator's own assessment of his [or her] contractual authority."'" (*Greenspan v. LADT LLC* (2010) 185 Cal.App.4th 1413, 1437; see *Safari Associates*, *supra*, 231 Cal.App.4th at p. 1408; *O'Flaherty v. Belgum*, *supra*, 115 Cal.App.4th at p. 1056.)

B.     *The Arbitrator Did Not Exceed His Powers by Adding*
       *Cohen's Clients as Claimants to the Arbitration*

TNP and the Programs contend the arbitrator exceeded his authority by adding Cohen's clients as claimants in the arbitration. TNP and the Programs argue that such a "substitution of parties in an action should not [be] permitted

39

where it will prejudice existing parties" and that the arbitrator's action prejudiced them.

As a preliminary matter, we have serious concerns about whether the notice of appeal filed by TNP and the Programs gives us jurisdiction to review this argument. TNP and the Programs did not appeal from the judgment; they appealed from the order granting the petition to compel arbitration. The notice of appeal stated TNP and the Programs "hereby appeal from the Order on Plaintiffs' Motion to Compel Binding Arbitration filed January 30, 2013, which order was made final and appealable by the entry of judgment on July 1, 2015." Normally, "[a]n order granting a petition to compel arbitration is not appealable, but is reviewable on appeal from a subsequent judgment on the award." (*Jenks v. DLA Piper Rudnick Gray Cary US LLP* (2015) 243 Cal.App.4th 1, 7.) The notice of appeal, however, does not state that TNP and the Programs appeal from the subsequent judgment. Nevertheless, we will liberally construe the notice of appeal from the nonappealable order compelling arbitration to include an appeal from the subsequent judgment for purposes of reviewing the order compelling arbitration. (See *Etheridge v. Reins Internat. California, Inc.* (2009) 172 Cal.App.4th 908, 913, fn. 7; Cal. Rules of Court, rule 8.100(a)(2).) But because the notice of appeal does not state that TNP and the Programs appeal from the judgment or the order confirming and denying the motion to vacate the arbitration award, our jurisdiction may not extend to arguments by TNP and the Programs relating to the trial court's order denying their petition to vacate the award.[17]

---

[17]     Our reversal of the judgment against Thompson and TNP in connection with the 2008 Program moots some of these

40

In any event, there is no merit to the argument by TNP and the Programs that the arbitrator exceeded his authority by adding Cohen's clients as claimants to the arbitration. "'"The powers of an arbitrator derive from, and are limited by, the agreement to arbitrate." . . . Thus, in determining whether the arbitrator[ ] exceeded the scope of [his] powers here, we first look to the parties' agreement to see whether it placed any limitations on the arbitrator['s] authority.'" (*Greenspan v. LADT LLC*, *supra*, 185 Cal.App.4th at p. 1437.) The arbitration provision in the subscription agreements stated that the rules and procedures of the AAA would apply to any arbitration. Rule R-6 of the AAA Commercial Arbitration Rules and Mediation Procedures, titled "Changes of Claim," allows an arbitrator to approve amendments to claims after the proceedings commence.[18] TNP and the

---

arguments. In addition, by not raising it in the trial court, TNP and the Programs forfeited their argument that the terms of TNP's guaranty precluded an award against TNP in favor of fewer than all the noteholders and in a proceeding that was not authorized by a majority vote of the noteholders. (See, *Richey*, *supra*, 60 Cal.4th at p. 920, fn. 3.) The argument is also meritless because the arbitrator had authority to interpret the language of the guaranty and because the language of the guaranty does not require a majority of noteholders to agree to bring suit against TNP and does not preclude recovery in favor of fewer than a majority of noteholders.

[18] Rule R-6(b) of the AAA Commercial Arbitration Rules and Mediation Procedures states, "Any new or different claim or counterclaim, as opposed to an increase or decrease in the amount of a pending claim or counterclaim, shall be made in writing and filed with the AAA, and a copy shall be provided to the other party, who shall have a period of 14 calendar days from

41

Programs do not suggest this rule precludes arbitrators from substituting or adding claimants.

Moreover, TNP and the Programs conceded that adding Cohen's clients as parties to the arbitration was within the scope of the arbitrator's powers by submitting the issue to the arbitrator. (See *J.C. Gury Co. v. Nippon Carbide Industries (USA) Inc.* (2007) 152 Cal.App.4th 1300, 1305 ["courts look both to the contract and to the scope of the submissions to determine the arbitrator's authority"]; *Porter v. Golden Eagle Ins. Co.* (1996) 43 Cal.App.4th 1282, 1292 [same].) In their response to the Plan's motion to amend the caption, TNP and the Programs opposed the motion and referred to previous filings in the arbitration proceeding (not included in the record on appeal) explaining their position. They also argued the motion to amend was untimely. They did not argue the arbitrator lacked authority to decide whether to add the clients as claimants. TNP and the Programs have not shown the arbitrator exceeded his authority by applying the rules specified in the arbitration agreement.[19]

---

the date of such transmittal within which to file an answer to the proposed change of claim or counterclaim with the AAA. After the arbitrator is appointed, however, no new or different claim may be submitted except with the arbitrator's consent." (AAA Commercial Arbitration Rules and Mediation Procedures (effective Oct. 1, 2013), available at https://www.adr.org/sites/default/files/CommercialRules_Web.pdf, as of January 29, 2019.)

[19] TNP and the Programs also suggest the arbitrator should have dismissed or stayed the arbitration after determining Cohen lacked standing and allowed the parties to return to court "for a determination of who the proper parties were and which claims they were entitled to arbitrate." The Plan, however, was a

42

C. *The Arbitrator Did Not Exceed His Powers by Not Awarding Damages to the Plan*

The Plan contends the arbitrator exceeded his authority under the arbitration agreement by refusing to award the Plan damages for breach of contract. The arbitrator found the Plan "was not an innocently injured investor" because it "could not have relied upon misrepresentations made by Cohen, unlike Cohen's clients." The arbitrator essentially found Cohen's unclean hands barred the breach of contract claim by his law firm's profit-sharing plan.

Rule R-47(a) of the AAA Commercial Arbitration Rules and Mediation Procedures provides in part: "The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties." The Supreme Court has described this rule as "'a broad grant of authority to fashion remedies' [citation], and as giving the arbitrator 'broad scope' in choice of relief [citations]." (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 383-384 (*Advanced Micro Devices*); accord, *Mave Enterprises, Inc. v. Travelers Indemnity Co.* (2013) 219 Cal.App.4th 1408, 1431.) Thus, the arbitrator had authority to grant relief he considered "just and fair under the circumstances existing at the time of arbitration, so long as the remedy may be rationally derived from the contract and the breach." (*Advanced Micro Devices*, at p. 383; accord, *Greenspan v. LADT, LLC, supra*, 185 Cal.App.4th at p. 1448; see *Emerald Aero, LLC v. Kaplan* (2017) 9 Cal.App.5th

claimant and had standing to pursue its claims even if Cohen did not.

43

1125, 1139 ["an arbitrator generally 'does not exceed his or her powers' when imposing a particular remedy if the remedy 'bears a rational relationship' to the underlying claim or breach, even if the remedy could not have been awarded by a jury or court"].)

Nothing in the 12% Program's arbitration provision or Rule R-47 of AAA Commercial Arbitration Rules and Mediation Procedures "indicates an intent to place any special restrictions on the arbitrator's discretion to fashion remedies." (*Advanced Micro Devices*, *supra*, 9 Cal.4th at p. 384; cf. *Carbajal v. CWPSC, Inc.* (2016) 245 Cal.App.4th 227, 253 ["[a]n arbitrator exceeds his or her powers when granting a remedy expressly forbidden by the parties' arbitration agreement"].) Moreover, the unclean hands doctrine the arbitrator applied is a recognized defense to a claim for breach of contract under California law, which the parties agreed would govern the 12% Program's subscription agreement. (See *Jade Fashion & Co., Inc. v. Harkham Industries, Inc.* (2014) 229 Cal.App.4th 635, 653-654.) "'The focus [of the unclean hands defense] is the equities of the relationship between the parties, and specifically whether the unclean hands affected the transaction at issue.'" (*Ibid.*; see *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 681 ["[t]he question is whether the unclean conduct relates directly 'to the *transaction* concerning which the complaint is made,' i.e., to the '*subject matter* involved' [citation], and not whether it is part of the basis upon which liability is being asserted"].) The terms of the arbitration agreement did not limit the arbitrator's power to fashion an equitable remedy, and the remedy he fashioned related directly to the Plan's breach of contract claim against the 12% Program. Therefore, the arbitrator did not violate California law, let alone exceed his

44

powers, by not awarding the Plan damages on its breach of contract claim.

The Plan argues "the Arbitrator had no jurisdiction to make any findings as to Cohen because Cohen never agreed to arbitrate." The Plan cites *Luster v. Collins* (1993) 15 Cal.App.4th 1338 for the proposition that an arbitrator exceeds his authority by making findings about a third party's liability. That case, however, held only that an arbitrator exceeded his authority by requiring a party to pay damages to a third party who did not participate in or agree to the arbitration. (*Id.* at p. 1350.) Here, the arbitrator did not require a party to compensate a third party who did not agree to arbitrate; the arbitrator denied recovery to a party to the arbitration agreement (the Plan) based on that party's conduct, which was related to the conduct of a third party (Cohen). The arbitrator concluded the Plan could not recover damages based on the finding that *the Plan* "was not an innocently injured investor," a finding well within his authority under the arbitration agreement and the rules of arbitration. (See *Moshonov v. Walsh* (2000) 22 Cal.4th 771, 776 (*Moshonov*) [arbitrator was empowered "to decide the law and facts of the case" under the agreed rules of arbitration]; see also *Gueyffier v. Ann Summers, Ltd.* (2008) 43 Cal.4th 1179, 1184 (*Gueyffier*) ["[w]hen parties contract to resolve their disputes by private arbitration, their agreement ordinarily contemplates that the arbitrator will have the power to decide any question of contract interpretation, historical fact or general law necessary, in the arbitrator's understanding of the case, to reach a decision"].) The arbitrator's resolution of this issue was "what the parties bargained for in the arbitration agreement." (*Moncharsh*, *supra*, 3 Cal.4th at p. 28.)

Moreover, the record does not support Cohen's contention he did not agree to arbitrate. Cohen initiated the arbitration, referring (falsely) to himself as a "Claimant." And when the Programs filed a counterclaim against Cohen for misrepresentation and indemnification, Cohen did not object to arbitrating the counterclaim.[20]

D. *The Arbitrator Did Not Exceed His Powers by Denying the Prevailing Parties' Request for Attorneys' Fees*

The arbitration provision in the subscription agreements entitled the prevailing party "to an award of its reasonable costs and expenses, including, but not limited to, attorneys' fees." The arbitrator concluded the amount of the fees paid to the attorneys who represented Cohen and (later) Cohen's clients was reasonable, but the arbitrator did not award attorneys' fees to the clients as the prevailing parties because "the attorneys' fees and costs were not paid by a prevailing party." As stated, the arbitrator found that Cohen, whose law firm had advanced the attorneys' fees and costs, was "culpable for advising his clients to invest in the Programs" and that Cohen's firm and the Plan were not prevailing parties. The arbitrator concluded: "Awarding attorneys' fees and costs to the law firm whose founding partner is a culpable party, who profited from his mistaken advice, would be a gross injustice and violate the equitable principle of unclean hands." The Plan contends the arbitrator exceeded his authority

_____

[20] According to Cohen and the Plan, the Programs abandoned the counterclaim before the arbitrator issued his award.

46

by refusing to award the clients their attorneys' fees as prevailing parties and effectively "rewriting" the subscription agreements.

### 1. *Applicable Law*

As discussed, a court may correct or vacate an arbitration award where the arbitrator exceeds his or her authority under the arbitration agreement or a submission to arbitration. (*Gueyffier*, *supra*, 43 Cal.4th at p. 1185; *Safari Associates*, *supra*, 231 Cal.App.4th at p. 1409.) Thus, "[a]n exception to the general rule assigning broad powers to the arbitrator[ ] arises when the parties have, in either the contract or an agreed submission to arbitration, explicitly and unambiguously limited those powers." (*Gueyffier*, at p. 1185; see *Advanced Micro Devices, supra,* 9 Cal.4th at pp. 375-376.)

The Plan contends the terms of the arbitration agreement limited the arbitrator's authority by requiring him to award the prevailing parties attorneys' fees. The Plan relies on *DiMarco*, *supra*, 31 Cal.App.4th 1809, where the court held an arbitrator exceeded his authority by refusing to award attorneys' fees to the prevailing party despite a provision of the arbitration agreement stating "'the prevailing party shall be entitled to reasonable attorney's fees and costs.'" (*Id.* at p. 1812, fn. 1.) The court in *DiMarco* reasoned that, once the arbitrator determined that a party was the prevailing party, the terms of the agreement compelled the arbitrator to award that party reasonable attorneys' fees. (*Id.* at p. 1815.)

This holding of *DiMarco* has not fared well in the decades since the court's decision. In *Moshonov*, *supra*, 22 Cal.4th 771 the Supreme Court clarified the circumstances in which an arbitrator may deny the prevailing party a contractual fee award

without exceeding his or her authority.  In that case the arbitrator denied the prevailing parties' request for attorneys' fees, finding the contractual attorneys' fees provision did not encompass the non-contractual tort claims on which the prevailing parties prevailed.  (*Id.* at p. 775.)  The Supreme Court refused to vacate or correct the award, restating well-settled law that arbitrators do not exceed their powers "merely by rendering an erroneous decision on a legal or factual issue, so long as the issue was within the scope of the controversy submitted to the arbitrators."  (*Id.* at p. 775; see *Moncharsh*, *supra*, 3 Cal.4th at pp. 11-12.)  The Supreme Court distinguished *DiMarco* (stating "[w]e need not decide whether *DiMarco*'s reasoning is correct") on the ground the arbitrator in *DiMarco* did not base his decision denying an award of attorneys' fees on an interpretation of the underlying contract, but on a mistaken belief the contract gave him discretion to deny fees to the prevailing party.  (*Moshonov*, at p. 779.)

In *Moore v. First Bank of San Luis Obispo* (2000) 22 Cal.4th 782 (*Moore*) the Supreme Court held that, where the parties submit the issue of attorneys' fees to the arbitrator, the arbitrator's ruling on the request for fees does not exceed his or her powers, even if the ruling is erroneous under California law.  (*Id.* at p. 784.)  As in *DiMarco*, the arbitration agreement in *Moore* appears to have mandated an award of attorneys' fees in certain circumstances,[21] but the arbitrator nevertheless required

---

[21]     The arbitration agreement provided that "plaintiff borrowers agreed to pay the Bank's 'collection costs,' including ' . . . attorneys' fees,'" and it incorporated deeds of trust that "entitl[ed] the Bank, but not the borrowers, to reasonable

48

each party to pay its attorneys' fees. (See *id.* at pp. 785-786.) The Supreme Court acknowledged that, unlike the arbitrator in *DiMarco*, the arbitrator in *Moore* did not designate a prevailing party. "That failure amounted at most to an error of law on a submitted issue, which does not exceed the arbitrators' powers under the holding of *Moncharsh, supra,* 3 Cal.4th at page 28. *DiMarco,* in which the arbitrator expressly designated a prevailing party but refused to award that party fees as mandated by the contract [citation], is thus distinguishable." (*Moore*, at p. 788.)

Eight years later, in *Gueyffier*, *supra*, 43 Cal.4th 1179, the Supreme Court considered whether an arbitrator exceeded his authority by excusing a party from complying with a notice-and-cure provision in an agreement that identified the provision as "'a material term of this Agreement [that] may not be modified or changed by any arbitrator in an arbitration proceeding or otherwise.'" (*Id.* at p. 1183.) The Supreme Court concluded the arbitrator did not exceed his powers because the agreement "did not unambiguously prohibit the arbitrator from *excusing performance* of a contractual condition." (*Id.* at p. 1185.) "The no-modification clause did not 'explicitly and unambiguously' [citation] bar the arbitrator from deciding that [the] notice-and-cure provision was *inapplicable* on the facts of the case as he found them." (*Ibid*.) The Supreme Court acknowledged the "no-modification clause could perhaps be *interpreted* as also precluding equitable excusal of a condition, but the arbitrator

---

attorney fees '[i]f Lender institutes any suit or action to enforce any of the terms of this Deed of Trust.'" (*Moore, supra*, 22 Cal.4th at p. 785.)

evidently did not adopt such an interpretation. As construction of the contract was for the arbitrator, not the courts, we cannot say he exceeded his powers, within the meaning of section 1286.2, subdivision (a)(4), by failing to adopt a particular interpretation of the agreement." (*Gueyffier*, at p. 1186.) The Supreme Court distinguished *DiMarco*, observing that the court in *DiMarco* "found a direct, explicit contradiction between the contractual command and the arbitrator's refusal to award the prevailing party fees, whereas no such inescapable contradiction exists in this case." (*Gueyffier*, at p. 1188.)

Safari Associates, supra, 231 Cal.App.4th 1400 relied on *Gueyffier* in declining to follow *DiMarco* and refusing to correct an arbitration award that contradicted the terms of an attorneys' fee provision. (*Safari Associates*, at p. 1412.) The arbitration agreement in *Safari Associates* stated California law would govern the agreement, but included a definition of "prevailing parties" that conflicted with the definition in Civil Code section 1717. (*Safari Associates*, at p. 1403.) The arbitrator declared the language in the attorneys' fee provision void, found one party the "prevailing party" under Civil Code section 1717, and awarded that party attorneys' fees. (*Safari Associates*, at pp. 1403, 1406.) The other party cited *DiMarco* in support of its argument that the arbitrator exceeded his powers in light of the contrary language in the arbitration agreement. (*Safari Associates*, at p. 1412.) The court in *Safari Associates* declined to follow *DiMarco*, explaining: "To the extent that *DiMarco* can be read as holding that a trial court may vacate an arbitration award on the ground that the arbitrator 'explicit[ly] contradict[ed]' the parties' agreement [citations], we decline to follow such reasoning. In our view, under the reasoning of *Gueyffier* [citation], *Moore* [citation],

50

and *Moshonov* [citation], a legally incorrect decision, even one that 'explicitly contradict[s]' the parties' agreement, is just that— a legally incorrect decision, which is not subject to correction by a trial court." (*Safari Associates*, at pp. 1412-1413, fn. omitted.)

We agree with the court in *Safari Associates* that, in light of *Moshonov*, *Moore,* and *Gueyffier*, the reasoning of *DiMarco* is not persuasive. Indeed, even the court that decided *DiMarco* has acknowledged that subsequent Supreme Court opinions have "expressed ambivalence about the *DiMarco* decision." (*Century City Medical Plaza v. Sperling, Isaacs & Eisenberg* (2001) 86 Cal.App.4th 865, 881.) As the Supreme Court in *Moore* explained, "Where the entitlement of a party to attorney fees under Civil Code section 1717 is within the scope of the issues submitted for binding arbitration, the arbitrators do not 'exceed[ ] their powers' [citations], as we have understood that narrow limitation on arbitral finality, by denying the party's request for fees, even where such a denial order would be reversible legal error if made by a court in civil litigation." (*Moore, supra,* 22 Cal.4th at p. 784.) Similarly, where a party submits the issue of attorneys' fees to the arbitrator, the party cannot argue the arbitrator exceeded his powers within the meaning of section 1286.6, subdivision (b), by deciding the issue, even if the arbitrator decided it incorrectly. (*Moore*, at p. 787.) Thus, "where an arbitrator's denial of fees to a prevailing party rests on the arbitrator's interpretation of a contractual provision within the scope of the issues submitted for binding arbitration, the arbitrator has not 'exceeded [his or her] powers.'" (*Moshonov*, *supra*, 22 Cal.4th at p. 773.)

51

### 2. *The Subscription Agreements Did Not Restrict the Arbitrator's Power To Deny Attorneys' Fees to the Prevailing Party*

The parties submitted the issue of attorneys' fees to the arbitrator.[22] In ruling on that issue, the arbitrator interpreted the subscription agreements as giving him discretion to deny an award of attorneys' fees where the prevailing parties' fees had been paid by a non-prevailing party. The arbitrator had the authority to make that interpretation. (See *Safari Associates*, *supra*, 231 Cal.App.4th at p. 1413.)

The subscription agreements did not explicitly and unambiguously limit the arbitrator's power to interpret the agreements in this manner. (See *Gueyffier*, *supra*, 43 Cal.4th at p. 1185.) In *Gueyffier* the Supreme Court stated the parties could have prohibited the arbitrator from excusing performance of material conditions, for example, by "expressly agreeing that the arbitrator would have no power to 'modify, change or excuse performance of' a material term." (*Gueyffier*, at p. 1185, fn. 3.) In *Safari Associates* the court stated the parties could have limited "the arbitrator's power to apply a definition of prevailing party other than the definition contained in the [arbitration] [a]greement" by including in the agreement language "evincing such an intent." (*Safari Associates*, *supra*, 231 Cal.App.4th at p. 1411, italics omitted.) The court in *Safari Associates* held that,

---

[22] The record does not include many of the parties' submissions to the arbitrator, but the motion to correct the award of the arbitrator filed by the Cohen Parties referred to their supplemental closing brief to the arbitrator, in which they requested an award of reasonable attorneys' fees and costs.

absent such language, "we may not construe the provision in the [a]greement defining the term 'prevailing party,' as being an 'explicit[ ] and unambiguous[ ]' [citation] limitation on the arbitrator's powers." (*Id.* at p. 1412.) Similarly, had the parties to the subscription agreements here wanted to tie the hands of the arbitrator, they could have included language requiring the arbitrator to award attorneys' fees to the prevailing party.

The attorneys' fees provision here did not do that. To construe it otherwise would "intrude upon the 'broad powers' [citation] of the arbitrator to decide" questions of contract interpretation and would "improperly expand the 'narrow limitation on arbitral finality.'" (*Safari Associates*, *supra*, 231 Cal.App.4th at p. 1412, citing *Gueyffier*, *supra*, 43 Cal.4th at p. 1185, fn. 3 and *Moore*, *supra*, 22 Cal.4th at p. 787.) Therefore, because the arbitrator's award was rationally related to the contract and the breach, the arbitrator had the authority to decide whether to award attorneys' fees to the prevailing parties "'on principles of equity and good conscience, and make [his] award *ex aequo et bono* [according to what is just and good].'" (*Moncharsh*, *supra*, 3 Cal.4th at p. 11; accord, *Kelly Sutherlin McLeod Architecture, Inc. v. Schneickert* (2011) 194 Cal.App.4th 519, 530.)

IV. *The Trial Court Erred by Denying Attorneys' Fees to the Prevailing Parties in the Postarbitration Court Proceedings*

The Cohen Parties filed a motion for attorneys' fees incurred in litigating the petition to vacate and the cross-petitions to correct the award. The trial court denied the motion, suggesting it agreed with the arbitrator's ruling and reasons for

denying an award of attorneys' fees. The court stated, "I think the arbitrator had the authority and the analysis to do what was done in the arbitration. I'm just going to leave it the way it is and deny the motion for attorneys' fees." The court did not appear to have considered whether the Cohen Parties were prevailing parties in postarbitration proceedings. The Plan and Cohen's clients correctly contend the trial court erred.

### A.  *Applicable Law*

Section 1293.2 provides "[t]he court shall award costs upon any judicial proceeding under this title [governing arbitration] as provided in Chapter 6 (commencing with Section 1021) . . . of this code." Section 1033.5, subdivision (a)(10)(A), provides that items recoverable as costs include attorneys' fees when authorized by contract. "The judicial proceedings covered by this provision include petitions to confirm or vacate an arbitration award." (*Marcus & Millichap Real Estate Investment Brokerage Co. v. Woodman Investment Group* (2005) 129 Cal.App.4th 508, 513 (*Marcus & Millichap*); accord, *Heimlich v. Shivji* (2017) 12 Cal.App.5th 152, 161-162, review granted Aug. 23, 2017, S243029.)

"The award of costs pursuant to section 1293.2, including attorney fees when authorized by contract, is mandatory." (*Marcus & Millichap*, *supra*, 129 Cal.App.4th at p. 513; see *Corona v. Amherst Partners* (2003) 107 Cal.App.4th 701, 707 ["[a] court must award costs in a judicial proceeding to confirm, correct or vacate an arbitration award"]; *Carole Ring & Associates v. Nicastro* (2001) 87 Cal.App.4th 253, 260 (*Carole Ring*) ["the superior court was required to award [the prevailing party] reasonable attorney fees and costs for post-arbitration judicial

proceedings, pursuant to the statutory scheme governing arbitration"].)

Postarbitration proceedings are distinct from arbitration proceedings, and it may be that the prevailing party in the arbitration is not the prevailing party in postarbitration proceedings. (*Marcus & Millichap*, *supra*, 129 Cal.App.4th at pp. 514, 516; see *Carole Ring*, *supra*, 87 Cal.App.4th at p. 261.) Courts look to section 1032 to determine which party is the prevailing party in postarbitration proceedings. (*Marcus & Millichap*, at p. 514.)[23] Section 1032, subdivision (a)(4), defines "[p]revailing party" to include "the party with a net monetary recovery, a defendant in whose favor a dismissal is entered, a defendant where neither plaintiff nor defendant obtains any relief, and a defendant as against those plaintiffs who do not recover any relief against that defendant."

B.    *The Trial Court Erred in Denying the Request by the Plan and Cohen's Clients for Attorneys' Fees Incurred in the Postarbitration Proceedings*

---

[23]    The court in *Carole Ring* looked to Civil Code section 1717 to determine whether a party was the "prevailing party" for purposes of awarding postarbitration attorneys' fees. (*Carole Ring*, *supra*, 87 Cal.App.4th at p. 261.) Like section 1032, subdivision (a)(4), Civil Code section 1717 defines "prevailing party" as "the party who recovered a greater relief in the action on the contract." (Civ. Code, § 1717, subd. (b)(1).) Section 1032 is the applicable authority, however, because section 1293.2, which governs costs recoverable in arbitration proceedings, cites the chapter of the Code of Civil Procedure that includes section 1032.

The Cohen Parties requested attorneys' fees after the trial court confirmed the arbitration award and denied two of the Cohen Parties' cross-petitions to correct the award. As discussed, the subscription agreements included a mandatory attorneys' fees provision, and the Plan and Cohen's clients were prevailing parties in the postarbitration proceedings because they successfully defeated the petition to vacate the award and successfully confirmed the monetary awards in favor of Cohen's clients. (See *Marcus & Millichap*, *supra*, 129 Cal.App.4th at p. 514 [parties that defeated the petition to confirm were the prevailing parties "[a]s a matter of law"]; *Carole Ring*, *supra*, 87 Cal.App.4th at p. 261 [party that obtained reversal on appeal with directions to the trial court to enter judgment confirming an arbitration award was the prevailing party].) The fact that the arbitrator denied attorneys' fees to the Cohen Parties did not give the trial court discretion to deny attorneys' fees under section 1293.2.

Because the Plan and Cohen's clients were the prevailing parties, the mandatory language of the contractual attorneys' fees clause and section 1293.2 entitled them to reasonable attorneys' fees incurred in the postarbitration judicial proceedings. Their entitlement to fees, however, was limited to attorneys' fees incurred in opposing the petition to vacate and bringing the cross-petition to correct the award in favor of the client investor whose award was inadvertently misstated and corrected. The Plan and the clients did not prevail on their other two cross-petitions. Therefore, we remand to the trial court with directions to determine the appropriate amount of attorneys' fees to be awarded. (See *Corona v. Amherst Partners*, *supra*, 107 Cal.App.4th at p. 707.)

56

## DISPOSITION

The judgment is vacated. The matter is remanded with directions for the trial court (1) to vacate the order compelling Thompson and TNP to arbitrate and to enter a new order denying the petition to compel Thompson to arbitrate and granting the petition to compel TNP to arbitrate claims involving the 12% Program only; (2) to vacate the order confirming the arbitration award and to enter a new order confirming the award against the Programs and against TNP with respect to the 12% Program only; and (3) to vacate the order denying the motion for attorneys' fees for postarbitration court proceedings and to enter a new order granting reasonable fees in an amount to be determined by the trial court. The motion to strike and request for judicial notice are denied. The parties are to bear their costs on appeal.


SEGAL, J.

We concur:


PERLUSS, P. J.                    FEUER, J.