Filed 4/4/23 Zaklit v. Hankey Investment CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| MAYRON ZAKLIT, | B314081 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. 21STCV05216 |
| v. | |
| HANKEY INVESTMENT COMPANY, LP, et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Maureen Duffy-Lewis, Judge. Reversed with directions.

Molino & Berardino, The Molino Firm, Michelle Cooper, Benjamin John Carter, John C. Holmes and Ed Chung for Defendants and Appellants.

Winer, Burritt & Scott, Kelli D. Burritt; Gusdorff Law and Janet Gusdorff for Plaintiff and Respondent.

Hankey Investment Company, LP, Hankey Finance Company, Inc., Westlake Financial Services[1] (Westlake), Christian Torrez, Brian Renfro, and Kelechi Ogbunamiri (collectively, defendants) appeal from the trial court's order denying their petition to compel arbitration of Mayron Zaklit's sexual harassment complaint. We reverse.

**FACTS AND PROCEDURAL BACKGROUND**

1.   *The parties*

Zaklit alleges Hankey Investment Company, LP, Hankey Finance Company, Inc., Hankey Group, and Westlake (collectively, the corporate defendants) collectively employed her,[2] beginning in May 2017, as the manager of recruitment and retention and then as the manager of people and culture. The individual defendants, Torrez, Renfro, and Ogbunamiri allegedly were "employed by" the corporate defendants as "officers, directors, managing agents, managers, and/or supervisors."

Hankey Investment Company contractually provides human resources to the Hankey Group companies, including, Hankey Investment Company, LP, Hankey Finance Company, Inc., and Westlake. Westlake is a finance company that "specializes in the acquisition and servicing of prime to subprime automotive retail installment contracts from over 15,000 new

---

[1]   Westlake Financial Services is actually "Westlake Services, LLC."

[2]   According to defendants, the "Hankey Group" is not an entity but an informal name referring to an associated group of companies that includes the corporate defendants. We refer to the three defendants with the name "Hankey" as the "Hankey defendants" or nonsignatory corporate defendants.

and used car dealerships throughout the United States." Its employees deal with consumers and dealers in all 50 states. Hankey Investment Company is a commercial real estate developer and investor that underwrites, produces, and manages commercial real estate. Hankey Finance Company owns "vehicle portfolios used on interstate highways." It has no employees.

## 2. *Zaklit's complaint*

On February 9, 2021, Zaklit filed a sexual harassment and retaliation lawsuit against defendants. She alleged she was jointly employed by the corporate defendants and was supervised by the individual defendants. Zaklit alleged that, shortly after her employment began, and continuing through mid-January 2020, she was subjected to a hostile work environment, including by comments about women's appearance, including hers, accompanied by leering; belittling remarks about women's opinions, including hers; being impliedly told by the director of marketing during a meeting that she should shut her mouth; and other behavior.

In October 2019, the corporate defendants held an event for about 50 "company 'leaders'—director-level and up" at a hotel from Thursday through Saturday. Zaklit attended as part of the human resources team. Allegedly, at that event, Torrez approached Zaklit and asked her to have a threesome with another employee; Renfro asked her to go back to his room; and Ogbunamiri, after helping Zaklit carry items from the event to her room for safekeeping, sat down on the bed uninvited with his shoes off and would not leave right away.[3] Zaklit told the

---

[3] At the time, Torrez was the director of flooring, Renfro was the senior vice president of servicing, and Ogbunamiri was the chief investment officer.

3

vice president of human resources Tonia Douglas what had happened. She responded that she had seen what happened, but Zaklit looked to be " 'okay.' "

Zaklit alleged she dreaded going to work, her mental and physical health deteriorated, and she took disability leave in January 2020. She alleged she "had no choice but to resign from her employment due to Defendants' failure to provide a safe work environment for her to return to, and failure to protect [her] from being subjected to further harassment." Zaklit resigned on January 18, 2021.

Zaklit's complaint asserts four causes of action under the Fair Employment and Housing Act (Gov. Code, § 12940 et seq.; FEHA) for quid pro quo sexual harassment (against all defendants), hostile work environment based on gender, sex and sexual orientation (against all defendants), retaliation (against the corporate defendants), and failure to take reasonable steps to prevent discrimination, harassment, and retaliation (against the corporate defendants); intentional infliction of emotional distress (against all defendants); violation of the Ralph Act (Civ. Code, § 51.7) for intimidation and implied threat of violence (against Ogbunamiri and the corporate defendants); gender violence (Civ. Code, § 52.4) (against Ogbunamiri); battery (against Torrez and the corporate defendants), and constructive wrongful termination in violation of public policy (against the corporate defendants).

3. *Litigation over defendants' petition to compel arbitration*

On March 21, 2021, defendants' counsel asked Zaklit's counsel whether she would stipulate to arbitrate the matter before the AAA as provided for in a dispute resolution agreement

4

she had signed.[4] Counsel agreed a provision in the agreement excluding the right to punitive damages or injunctive relief should be severed from it, and said defendants would ask the court to do so. Zaklit's counsel declined to stipulate. On March 26, 2021, defendants filed a joint petition to compel arbitration.

As part of their petition, defendants provided the trial court with three different arbitration agreements Zaklit had signed. On March 24, 2017, Zaklit submitted a signed employment application to "Westlake Financial Services" that included her agreement to "submit to binding arbitration all disputes and claims arising out of submission of this application," and acknowledged that, if hired, all disputes that "might arise out of [her] employment with Westlake Financial Services . . . will be submitted to binding arbitration."

That same day Zaklit also signed a separate "Applicant's Statement and Agreement" that acknowledged, among other things, Zaklit's and "the [c]ompany['s]" agreement to submit any disputes between them to binding arbitration.

On May 20, 2017, Zaklit electronically signed the same agreement. On that same day, Zaklit and "Alexa Soto – Corporate Recruiter," as the Company representative, electronically signed a two-page "Employer-Employee Dispute Resolution Agreement" (DRA). The DRA states it is a "[m]utual [a]greement to [a]rbitrate" between the "undersigned employee" —Zaklit—and Westlake Services, Inc. d/b/a Westlake Financial

---

[4] Defendants' counsel also mentioned Zaklit had signed an "Applicant's Statement" that provided for binding arbitration and had initialed her consent to arbitration in her employment application.

Services, "including any and all subsidiary companies including but not limited to Wilshire Consumer Credit, Westlake Flooring, Western Funding, hereinafter ('Company')."

The agreement includes nine numbered and separately-headed paragraphs. We need not describe them all here. The first paragraph states Zaklit

> "agrees to submit to binding arbitration before a neutral arbitrator all disputes and claims arising out of submission of my employment application or any and all disputes that may arise out of or already exist related to my employment or relationship with Employer,[5] whether during or after that employment, including, but not limited to . . . claims for discrimination . . . and claims for violation of any federal, state or other governmental constitution, statute, ordinance or regulation. I understand that this Agreement to Arbitrate applies to claims that pre-exist or may pre-exist the date of the Agreement."

The middle of the paragraph states, in bold face type, "I understand and acknowledge that I am waiving my right to a jury trial." The paragraph states the Federal Arbitration Act (FAA) will govern the arbitration, as well as section 1280 et seq. of the California Code of Civil Procedure, to the extent it "is not contradictory to or preempted by federal law."

The third paragraph governing "Arbitration Procedure" states the arbitration will be conducted by "an impartial

---

5       The agreement does not appear to define "Employer."

arbitrator experienced in employment law selected from either" JAMS, ARS, or AAA, "at the election of the Company in accordance with the applicable entity's then-current employment arbitration rules (except as otherwise provided in this agreement)." The Company is to pay the Arbitrator's fees and arbitration expenses. The sixth paragraph provides for the arbitrator to decide any "issue or dispute concerning the formation, applicability, interpretation or enforceability" of the agreement.

Defendants' reply brief included evidence showing that, on May 18, 2017, "Onboarding <HR@hankeyinvestments.com>" sent Zaklit a "Welcome" email signed by "Human Resources Department[,] Westlake Financial Services," instructing Zaklit to complete "New Hire paperwork online" before coming to orientation. On May 20, 2017, Alexa Soto, an HR employee at the time, electronically sent Zaklit "New Hire" documents to sign electronically through a "docusign portal." Soto's reply email was listed as "asoto6@westlakefinancial.com." The Applicant's Statement and DRA were among those documents. Zaklit electronically signed them and the other new-hire documents on May 20, 2017.

In their petition, defendants argued the DRA delegated to the arbitrator any question relating to the DRA's enforceability. They nonetheless asked the court to sever the clause limiting punitive damages and injunctive relief from the DRA, but asserted that if the court determined the DRA was unenforceable, defendants "aver that the arbitration agreements contained in

7

the Application, and Applicant's Statement are enforceable."[6] Defendants also argued the nonsignatory defendants could enforce the arbitration agreements because the complaint alleged they were acting as Westlake's agents.

Zaklit opposed the motion, arguing defendants' motion to compel concerned an arbitration agreement between plaintiff and Westlake only with no basis to require her to arbitrate her claims against the nonsignatory defendants; defendants failed to prove she signed any agreement to arbitrate; and the arbitration agreements were unconscionable.

In her declaration submitted in support of her opposition, Zaklit declared she was hired and began her employment with all the corporate defendants in May 2017, the individual defendants sexually harassed her at work, and, despite her complaints, "no one ever really helped [her]."

She declared that when she was hired, she was required to sign several documents. She was told she had to complete and sign the documents before starting work, and, "[i]f the arbitration agreement was even in those documents, it was not discussed or explained to me." Zaklit asserted she "did not even know what arbitration was at that time." Zaklit declared she "wanted and needed the job so [she] did what [she] was told." She averred she "felt pressure to click on whatever links, and electronically sign whatever legal documents appeared on [her] screen that Westlake . . . presented to [her] prior to [her] employment."

---

[6]    In their reply, defendants clarified the petition sought to enforce the DRA and would seek to enforce the other agreements only if the court found the DRA unenforceable.

8

Zaklit also stated she "was electronically presented with numerous complex legal documents and was never informed nor aware that [she] was possibly signing an 'arbitration agreement.' " She did not have an opportunity to consult with an attorney before signing the documents, Westlake did not explain the documents to her, and she had "no recollection of actually signing any arbitration agreement." Zaklit declared she did not learn she allegedly had signed an arbitration agreement until she filed her complaint.

### 4. *The court's order denying defendants' petition*

The trial court heard defendants' petition on June 3, 2021, and took the matter under submission. There is no reporter's transcript in the appellate record. The trial court issued a written ruling denying the petition on June 11, 2021.

The court found Zaklit had signed the arbitration agreements, but the agreements were procedurally and substantively unconscionable. The court found the arbitration agreements were not the same, and there were "some contradictions." Describing defendants as able to "pick and choose which of the three documents they seek to enforce," the court found the agreements lacked mutuality.

The court also ruled the nonsignatory defendants could not enforce the DRA, finding there was "not sufficient identity of parties, the non-signatory [defendants were] not the agent for any party to the arbitration agreement and the non-signatories [were] not third-party beneficiaries of the agreement." Defendants timely appealed.[7]

---

[7] An order denying a petition to compel arbitration is immediately appealable. (Code Civ. Proc., § 1294, subd. (a).)

**DISCUSSION**

**1.** *Applicable law and standards of review*

Under both the Federal Arbitration Act (FAA) and California law, arbitration agreements are enforceable unless revocable under state law on grounds that exist for any contract, such as fraud, duress, and unconscionability. (9 U.S.C. § 2; Code Civ. Proc., § 128; *Viking River Cruises, Inc. v. Moriana* (2022) __ U.S. __, __ [142 S.Ct. 1906, 1917]; *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 97–98 (*Armendariz*).) The FAA applies to arbitration agreements involving interstate commerce. (9 U.S.C. § 2; *Tiri v. Lucky Chances, Inc.* (2014) 226 Cal.App.4th 231, 240 (*Tiri*).) However, " '[i]n most important respects, the California statutory scheme on enforcement of private arbitration agreements is similar to the [FAA]' . . . . Thus, enforcing valid arbitration agreements is favored under both state and federal law." (*Tiri*, at pp. 239–240, quoting *Rosenthal v. Great Western Financial Securities Corp.* (1996) 14 Cal.4th 394, 406 (*Rosenthal*); but see *Rosenthal*, at p. 405 [FAA sets forth "a liberal federal policy favoring arbitration agreements, notwithstanding any state or procedural policies to the contrary," and thus "preempts any contrary state law and is binding on state courts as well as federal"].)

" 'General principles of contract law determine whether the parties have entered a binding agreement to arbitrate.' " (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236.) A party seeking to compel arbitration bears the burden of proving the existence of an arbitration agreement, and the party opposing the petition bears the burden of establishing a defense to the agreement's enforcement. (*Engalla v. Permanente Medical Group, Inc.* (1997)

10

15 Cal.4th 951, 972.)  On a petition to compel arbitration, the trial court sits as the trier of fact, weighing all the affidavits, declarations, and other documentary evidence to determine whether the parties agreed to arbitrate.  (*Ibid*.; *Rosenthal, supra*, 14 Cal.4th at pp. 413–414.)

" ' "There is no uniform standard of review for evaluating an order denying a motion to compel arbitration.  [Citation.]  If the court's order is based on a decision of fact, then we adopt a substantial evidence standard.  [Citations.]  Alternatively, if the court's denial rests solely on a decision of law, then a de novo standard of review is employed." ' "  (*Chambers v. Crown Asset Management, LLC* (2021) 71 Cal.App.5th 583, 591.)

**2.     *The operative arbitration agreement***

The trial court found Zaklit electronically signed the DRA and Applicant's Statement in May 2017, and signed the Application and Applicant's Statement in March 2017, based on Zaklit's and defendants' human resources representative's declarations.  Substantial evidence thus supports the *existence* of an arbitration agreement.  Zaklit does not contest the court's finding that she signed the three arbitration agreements in this appeal.

a.     *The DRA supersedes the other arbitration agreements*

Defendants presented three different arbitration agreements to the trial court:  the Application, signed in March 2017; the Applicant's Statement, signed in March 2017 and electronically signed in May 2017; and the DRA, electronically signed in May 2017.  The DRA, however, includes the following integration clause:

> "This is the complete agreement of the parties
> on the subject of arbitration of Claims.  This

11

Agreement supersedes any prior or contemporaneous oral or written agreement or understanding on the subject. In executing this Agreement, neither party is relying on any representation, oral or written, on the subject of the effect, enforceability or meaning of this Agreement, except as specifically set forth in this Agreement."

In both the moving and reply papers in support of their petition to compel arbitration, defendants asked the court to compel arbitration under the DRA, and, if the court determined the DRA was unenforceable, to compel arbitration under the Application and/or Applicant's Statement.

The trial court characterized defendants' argument as having "changed" in their reply and at the hearing to seek to enforce only the DRA.[8] The court found defendants' position— " 'if the DRA is not enforceable, then we seek to enforce the other documents['] "—demonstrated defendants could "pick and choose

---

[8] We do not read defendants' reply as taking a different stance from their petition. In the petition, after asking the court to sever the DRA's provision that excluded recovery of punitive damages or injunctive relief, defendants asserted that, if the court determined the DRA was unenforceable, they "aver[red]" the arbitration agreements in the Application and Applicant's Statement were enforceable. The petition thus argued plaintiff was bound to arbitrate her claims under the DRA "and/or" the Application "and/or" the Applicant's Statement. In their reply, as the trial court noted, defendants clarified their petition sought to enforce the DRA and included the other two arbitration agreements "only . . . in the event that the Court finds the DRA to be unenforceable or void/voidable."

which of the three documents . . . to enforce," supporting Zaklit's argument that the arbitration agreements lacked mutuality and thus were substantively unconscionable.  Neither the court nor Zaklit addressed whether the DRA in fact superseded the arbitration provisions in the Application and Applicant's Statement, however.

We agree with defendants that the DRA supersedes the arbitration agreements found in the Application and Applicant's Statement, which were signed before and/or contemporaneously with the DRA.  The DRA clearly states the parties intend it to be the "complete agreement of the parties" on the subject of arbitration and "supersedes any prior or contemporaneous" oral or written agreement on the subject.  (Civ. Code, § 1639 [parties' intent determined from writing alone if possible]; *id.*, § 1644 ["words of a contract are to be understood in their ordinary and popular sense"].)  Zaklit does not contend the parties intended otherwise or that the clause is somehow ambiguous.[9]  (See, e.g., *Grey v. American Management Services* (2012) 204 Cal.App.4th 803, 807, 809 [existence of an integration clause "is a key factor in divining" whether the parties " 'intended their writing to serve as the exclusive embodiment of their agreement' "; introduction of extrinsic evidence is prohibited to vary or contradict terms of integrated agreement but may be admitted to explain an ambiguity].)  Rather, she simply notes defendants continue to assert her claims are covered by all three arbitration agreements and to seek to enforce the clauses in the Application and

_____

[9]  In essence, Zaklit argues the parties' arbitration agreement is ambiguous because the three agreements contain different terms.  She does not, however, contend the terms of the DRA—standing alone—are ambiguous.

13

Applicant's Statement if this court finds the DRA is unenforceable.

As we have concluded the arbitration agreements in the Application and Applicant's Statement have been superseded, we consider only whether the trial court erred in denying defendants' petition to compel arbitration under the DRA.

b. *The FAA applies*

Here, defendants presented evidence that Westlake and its employees engage in interstate commerce through servicing and acquiring automotive retail installment contracts with dealerships throughout the United States. The parties also expressly designated the FAA would govern any arbitration under the DRA, as well as the California Arbitration Act (Code Civ. Proc., 1280 et seq.) "to the extent that California law is not contradictory to or preempted by federal law." "The FAA requires that courts enforce arbitration agreements according to their terms." (*Prima Donna Development Corp v. Wells Fargo Bank, N.A.* (2019) 42 Cal.App.5th 22, 35.) The FAA—and California law to the extent it does not conflict with the FAA—thus governs our interpretation of the DRA.[10]

**3.** ***The DRA's delegation clause is enforceable***

a. *Applicable law*

Ordinarily, courts determine the enforceability of an arbitration agreement. (*AT&T Technologies v. Communications Workers of America* (1986) 475 U.S. 643, 649.) "When the parties'

---

[10] Although Zaklit disputed the application of the FAA in her opposition to defendants' motion to compel, she does not challenge its application on appeal. In any event, our analysis here would be the same under both the FAA and California law. (See *Tiri, supra*, 226 Cal.App.4th at p. 240.)

contract delegates the arbitrability question to an arbitrator," however, "the courts must respect the parties' decision as embodied in the contract." (*Henry Schein, Inc. v. Archer & White Sales, Inc.* (2019) __ U.S. __, __ [139 S.Ct. 524, 531].) Nevertheless, "courts 'should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so.' " (*Ibid.*; see also *Chin v. Advanced Fresh Concepts Franchise Corp.* (2011) 194 Cal.App.4th 704, 709 ["When the parties ' "clearly and unmistakably" ' delegate issues of arbitrability to the arbitrator, the arbitrator, not the court, decides such issues as the scope of the arbitration agreement."]; *Malone v. Superior Court* (2014) 226 Cal.App.4th 1551, 1560 (*Malone*) [United States Supreme Court and California courts agree delegation clause "must be clear and unmistakable" to be enforceable].)

Under *Rent-A-Center, West, Inc. v. Jackson* (2010) 561 U.S. 63 (*Rent-A-Center*), "a party's challenge to the arbitration agreement does not invalidate the delegation clause, and therefore, the arbitrator, and not a court, must consider any challenge to the arbitration agreement as a whole." (*Tiri, supra,* 226 Cal.App.4th at p. 240, quoting *Rent-A-Center*, at p. 71; *Malone, supra*, 226 Cal.App.4th at pp. 1559–1560 [where party challenges arbitration agreement as a whole, delegation clause is severed and enforced, leaving arbitrator, not the court, to determine if agreement is enforceable].)

"In contrast, if the party is making a specific challenge to the delegation clause, the court must determine whether the delegation clause itself may be enforced and can only delegate the general issue of enforceability to the arbitrator if it first determines the delegation clause is enforceable." (*Malone, supra,*

226 Cal.App.4th at p. 1560, citing *Rent-A-Center, supra*, 561 U.S. at p. 70.) "Stated another way, *Rent-A-Center* acknowledges that while courts may consider enforceability challenges *specific to delegation clauses*, the arbitrator is to consider challenges to the arbitration agreement as a whole." (*Tiri, supra*, 226 Cal.App.4th at p. 240.)

"There are two prerequisites for a delegation clause to be effective. First, the language of the clause must be clear and unmistakable. [Citation.] Second, the delegation must not be revocable under state contract defenses such as fraud, duress, or unconscionability." (*Tiri, supra,* 226 Cal.App.4th at p. 242; see also *Rent-A-Center, supra,* 561 U.S. at pp. 68, 69, fn. 1.) "The 'clear and unmistakable' test reflects a '*heightened* standard of proof' that reverses the typical presumption in favor of the arbitration of disputes." (*Aanderud v. Superior Court* (2017) 13 Cal.App.5th 880, 892 (*Aanderud*).)

"An arbitration agreement is governed by contract law. It is construed like other contracts to give effect to the intention of the parties and the ordinary rules of contract interpretation apply. [Citation.] If the contractual language is clear and explicit, it governs." (*Mendoza v. Trans Valley Transport* (2022) 75 Cal.App.5th 748, 764 (*Mendoza*).)

b. *Analysis*

The DRA includes the following delegation clause in a separate paragraph with the heading, "Construction and Enforceability" (capitalization omitted):

> "Any issue or dispute concerning the formation, applicability, interpretation or enforceability of this Agreement, including any claim or contention that all or any part of this

16

Agreement is void or voidable, shall be subject to arbitration as provided herein.  The arbitrator, and not any federal, state or local court or agency, shall have authority to decide any such issue or dispute.  The decision of an arbitrator on any such issue or dispute, as well as on any Claim submitted to arbitration as provided in this Agreement, shall be final and binding upon the parties."

Zaklit argues "the delegation clause itself is part of the unconscionable mélange of contradictory terms among various agreements which renders the entire arbitration contractual scheme unconscionable."  She contends the delegation clause lacks mutuality—rendering it unconscionable—because the three arbitration clauses "contained contradictory terms, one such term of which is the presence and simultaneous absence of delegation clauses."  Zaklit continues that, given "this lack of mutuality," defendants "cannot sustain their burden of showing of ' "clear and unmistakable evidence" ' that the parties 'agreed to arbitrate arbitrability.' "  (Quoting, *Mendoza, supra,* 75 Cal.App.5th at p. 772 [" '[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is "clear and unmistakeabl[e]" evidence that they did so' "].)

In essence, Zaklit contends the delegation clause is unenforceable because the other agreements she signed do not contain a delegation clause, making it unclear whether the parties intended to arbitrate the issue of arbitrability.  We cannot agree.  As we discussed, the DRA superseded the arbitration clauses in the Application and Applicant's Statement.  That those arbitration agreements contained different terms, therefore, does

17

not make the DRA's delegation clause ambiguous nor lacking in mutuality.

Rather, the delegation clause in the DRA expressly grants authority to the arbitrator to decide threshold issues of arbitrability. It unambiguously provides that any dispute about the "formation, applicability, interpretation or enforceability" of the DRA—including whether it is void or voidable—is subject to arbitration, and the arbitrator, *not* the court, has the authority to decide any such dispute. Courts have found similar language sufficiently clear and unmistakable evidence of the parties' intent "to delegate all issues to an arbitrator, including issues of enforceability." (*Tiri, supra*, 226 Cal.App.4th at p. 242 [clause stating " '[t]he Arbitrator, and not any federal, state, or local court or agency, shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this Agreement . . . .' " met "clear and unmistakable" prerequisite]; see also *Malone, supra*, 226 Cal.App.4th at p. 1560 [clause providing " '[t]he arbitrator has exclusive authority to resolve any dispute relating to the interpretation, applicability, or enforceability of this binding arbitration agreement' " was "sufficiently clear and unmistakable" to be enforceable unless unconscionable]; *Aanderud, supra*, 13 Cal.App.5th at p. 892 [arbitration provision stating "the parties 'agree to arbitrate all disputes, claims and controversies arising out of or relating to . . . the interpretation, validity, or enforceability of this Agreement, including the determination of the scope or applicability of . . . [the "Arbitration

of Disputes" section]' " was "clear and unmistakable evidence that the parties intended to arbitrate arbitrability"].)[11]

As the DRA's delegation clause is clear and unmistakable, it was enforceable unless it specifically was revocable on state-law grounds—here, unconscionability. (*Rent-A-Center, supra,* 561 U.S. at p. 72; *Malone, supra,* 226 Cal.App.4th at p. 1560; *Tiri, supra,* 226 Cal.App.4th at p. 243.)

" '[U]nconscionability has both a "procedural" and a "substantive" element,' the former focusing on ' "oppression" ' or ' "surprise" ' due to unequal bargaining power, the latter on ' "overly harsh" ' or ' "one-sided" ' results." (*Armendariz, supra,* 24 Cal.4th at p. 114.) Both procedural and substantive unconscionability must be present for a court to be able to refuse to enforce a contract or a contract term, including an arbitration agreement, under the doctrine of unconscionability. (*Ibid.*) "But they need not be present in the same degree." (*Ibid.*) "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Ibid.*) The party opposing arbitration bears the burden of proving unconscionability. (*Tiri, supra,* 226 Cal.App.4th at p. 244.) As we discussed, when challenging the enforceability of a delegation clause, "any claim of unconscionability must be

---

[11] The delegation clause here did not use the term "exclusive authority," but the arbitrator's exclusive authority to determine issues of enforceability is implied by the provision that "[t]he arbitrator, and *not* any federal, state or local court or agency, shall have authority to decide any such issue or dispute." (Italics added.)

19

*specific to the delegation clause.*"[12] (*Ibid.*, citing *Rent-A-Center, supra,* 561 U.S. at p. 73.)

We have little trouble concluding substantial evidence supports the trial court's implied finding that the delegation clause was procedurally unconscionable. An arbitration agreement imposed as a condition of employment with no opportunity to negotiate is typically adhesive and demonstrates some level of procedural unconscionability. (*Armendariz, supra,* 24 Cal.4th at pp. 113, 114–115 [adhesive contract is a standardized contract that, " 'imposed and drafted by the party of superior strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it' "]; *Baltazar v. Forever 21, Inc.* (2016) 62 Cal.4th 1237, 1244 [adhesive contracts " 'contain a degree of procedural unconscionability even without any notable surprises, and "bear within them the clear danger of oppression and overreaching" ' "].)

The trial court found Zaklit's testimony sufficient to demonstrate the process of signing the arbitration agreements was procedurally unconscionable. "Where the trial court's determination of unconscionability is based upon the trial court's resolution of conflicts in the evidence, or on the factual inferences which may be drawn therefrom, we consider the evidence in the light most favorable to the court's determination and review

---

[12] Defendants argue Zaklit "waived [her] right to object to the delegation clause" because she did not specifically address it in her opposition to defendants' petition. As defendants' reliance on the superseded arbitration agreements as a "backup" if the DRA were not enforced was not entirely clear from the moving papers, we find Zaklit did not forfeit her challenge to the delegation clause.

those aspects of the determination for substantial evidence." (*Gutierrez v. Autowest, Inc.* (2003) 114 Cal.App.4th 77, 89.)

Zaklit declared she was told to complete and sign several "new-hire documents" before she could begin work. The record shows the DRA was one of the new-hire documents electronically provided to Zaklit for her signature. She declared she did not recall signing any arbitration agreement and "was never informed nor aware" that she "possibly" was signing an arbitration agreement. Zaklit also averred: she "felt pressure to click on whatever links, and electronically sign whatever legal documents appeared on [her] screen"; because she needed the job, she "was not in a position to argue about any of the documents or to negotiate any terms or even to refuse to sign documents"; she had no opportunity to consult with an attorney before signing the documents; and no one from Westlake explained the documents to her. We can infer the trial court found Zaklit's testimony credible and gave it more weight.

Defendants argued Zaklit's declaration "reveal[ed] no evidence . . . that the arbitration agreement was required on a 'take it or leave it' basis," as Zaklit never claimed she asked whether "the DRA was required or negotiable" or that anyone told her she must sign it as a condition of her employment. Defendants make a similar argument on appeal. The trial court rejected defendants' counterargument as relating "only to plaintiff's credibility." We also cannot conclude Zaklit did not meet her burden by failing to present evidence that she asked if the DRA were negotiable. (See *Tiri, supra*, 226 Cal.App.4th at p. 245 [human resources manager's statements that employee "was never told the agreement was nonnegotiable and that

21

[employee] never proposed changes fell far short of demonstrating an arm's-length bargaining transaction"].)

Zaklit's testimony and the documentary evidence in the record substantially support the trial court's implied finding that the DRA was an adhesion contract presented to Zaklit, along with its delegation clause, on a take-it-or-leave-it basis and thus bore some level of procedural unconscionability. (*Tiri, supra*, 226 Cal.App.4th at pp. 245–246 [agreeing with trial court's implied finding that delegation clause within contract of adhesion was procedurally unconscionable as it too was presented on take-it-or-leave-it basis].) Moreover, Zaklit was an unsophisticated party, having testified she did not know "what arbitration was," who was sent the DRA, with the delegation clause, only a few days before her start date among several other documents she was told to sign electronically before starting work. That, coupled with the " 'arcane nature' of the delegation clause, added to its oppression and surprise." (*Aanderud, supra*, 13 Cal.App.5th at p. 895.)

Although we conclude the delegation clause has some degree of procedural unconscionability, it nonetheless is valid because it is not substantively unconscionable. (*Tiri, supra*, 226 Cal.App.4th at p. 246; see also *Malone, supra*, 226 Cal.App.4th at p. 1570 [delegation clause part of arbitration agreement that was contract of adhesion demonstrated "some evidence of procedural unconscionability, which must be accompanied by a high showing of substantive unconscionability in order to result in the conclusion that the delegation clause is unenforceable" but had none and thus was valid].)

Contrary to Zaklit's contention, the DRA's *delegation clause* does not lack mutuality. Both Westlake and Zaklit are bound by

it equally:  "*Any* issue or dispute" concerning arbitrability—including applicability or enforceability of the DRA—is subject to arbitration, and the arbitrator's decision "on *any* such issue or dispute . . . [is] final and binding upon the parties."  (Italics added; see *Tiri, supra*, 226 Cal.App.4th at p. 247.)  Moreover, another panel of this court in *Malone*, as well as the First District in *Tiri*, concluded similar delegation clauses were not substantively unconscionable because they did not lack mutuality, were not otherwise unreasonably favorable to the employer, and were not "overly harsh or so one sided as to shock the conscience."  (*Malone, supra*, 226 Cal.App.4th at pp. 1557, 1570–1571; *Tiri,* at pp. 237, 246–247.)  Although defendants relied on both cases on appeal and in the trial court, Zaklit addressed neither.

　　We recognize the trial court found provisions within the DRA itself were substantively unconscionable for lack of mutuality:  the clause that excludes the right to punitive damages or injunctive relief—which defendants sought to sever—and a provision that excludes claims "by the Company for injunctive and/or other equitable relief for unfair competition and/or the unauthorized disclosure of trade secrets or confidential information."  Zaklit, however, does not argue how these provisions "*as applied to the delegation clause* render[ ] *that* clause unconscionable by impeding her ability to arbitrate whether the arbitration agreement as a whole is unconscionable."  (*Tiri, supra*, 226 Cal.App.4th at p. 248, citing *Rent-A-Center, supra*, 561 U.S. at p. 73.)

　　As we have concluded the delegation clause itself is not substantively unconscionable, whether or not these provisions are unconscionable and cannot be severed from the DRA—

rendering the DRA unenforceable—was for the arbitrator, not the trial court, to decide. (*Tiri, supra*, 226 Cal.App.4th at p. 250 [having determined similar delegation clause was valid, "it [would] be for the arbitrator to consider the conscionability of the agreement as a whole and its other severable provisions"]; *Malone, supra*, 226 Cal.App.4th at p. 1571 [determining similar delegation clause was not unconscionable and holding trial court "did not err in granting employer's motion to compel arbitration to permit the arbitrator to resolve [former employee's] challenges to the validity and enforceability of the arbitration agreement as a whole"].)

Finally, Zaklit urges us to find the arbitration agreement —and apparently the delegation clause itself—substantively unconscionable based on the passage of the "Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021" (Act), signed into law on March 3, 2022. (Pub.L. No. 117-90, 136 Stat. 26.) That statute invalidates predispute arbitration agreements that require arbitration of sexual assault or sexual harassment claims. (9 U.S.C. § 402(a).)

Zaklit concedes the Act does not apply retroactively but contends that, because "the presumptive favorable treatment of arbitration clauses supposedly flowing from the Federal Arbitration Act clearly no longer applies to arbitration clauses related to sexual harassment claims," we should invalidate the arbitration agreement here as against public policy. (Citing *Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1145 [unconscionability also concerns terms that "contravene the public interest or public policy"].)

We decline. The Act expressly notes it applies to " 'any dispute or claim that arises or accrues on or after the date of

enactment of this Act.' " (Hist. notes, 9 U.S.C. § 401; Pub.L. No. 117-90, § 3 (Mar. 3, 2022) 136 Stat. 28.) "Such plain language indicates no Congressional intent to apply the . . . Act retroactively. While the Act represents a significant sea change in the enforcement of arbitration provisions, Congress has chosen to temper that change through prospective rather than retrospective applicability." (*Zinsky v. Russin* (W.D.Pa. July 22, 2022, No. 2:22-cv-547) 2022 WL 2906371 at *4.)

Having concluded the trial court erred in denying at least Westlake's petition to compel arbitration, we next consider whether the court erred in finding the nonsignatory defendants not entitled to compel Zaklit to arbitrate her claims against them under the DRA.

**4.  *The nonsignatory defendants can enforce the DRA***

Generally, only a party to an arbitration agreement may enforce it. (*DMS Services, LLC v. Superior Court* (2012) 205 Cal.App.4th 1346, 1352 (*DMS Services*).) There is no dispute that the DRA is between Zaklit—the "Employee"—and Westlake, "including any and all subsidiary companies including but not limited to Wilshire Consumer Credit, Westlake Flooring, [and] Western Funding"—the "Company." Defendants do not contend the Hankey defendants are subsidiaries of Westlake but generally refer to them in their briefing as "sister companies of Westlake." And, as the trial court noted, unlike the superseded Applicant's Statement, the DRA does not expressly include managers or employees in the definition of "Company." Thus, Westlake is the only named defendant that is a party to the DRA.

Both California and federal courts, however, recognize nonsignatories to an agreement containing an arbitration provision may, in limited circumstances, compel arbitration

25

of "a dispute arising within the scope of that agreement." (*DMS Services*, 205 Cal.App.4th at p. 1353; *Garcia v. Pexco, LLC* (2017) 11 Cal.App.5th 782, 785–786 (*Garcia*).)  The DRA applies to "any and all disputes that may arise out of or already exist related to [Zaklit's] employment *or* relationship with Employer," including, among others, discrimination claims, tort claims, and claims for violation of any statute.  (Italics added.)  As all of Zaklit's claims involve alleged sexual harassment, retaliation, and related claims that arose from or were related to her employment, if the nonsignatory defendants can enforce the DRA against Zaklit, her claims against them unquestionably fall within the scope of the DRA.  Whether a nonsignatory defendant has standing to enforce an arbitration agreement is a question of law subject to de novo review.  (*Marenco v. DirectTV LLC* (2015) 233 Cal.App.4th 1409, 1416–1417 (*Marenco*).)

Nonsignatory defendants may compel arbitration under theories of agency and equitable estoppel,[13] and as third party

_____

[13]     The nonsignatory defendants appear to assert they can compel arbitration under the doctrine of equitable estoppel because all of Zaklit's causes of action against them and Westlake "are intimately founded in and intertwined with the employer's obligations."  That doctrine applies when " 'the causes of action against the nonsignatory are "intimately founded in and intertwined" with the underlying *contract* obligations.' "  (*Garcia, supra*, 11 Cal.App.5th at p. 786, italics added.)  Although Zaklit's claims are based on obligations her alleged joint employers owed her as their employee, they are not founded on, for example, an employment agreement that contained an arbitration provision.  Rather, the DRA is a stand-alone arbitration agreement.  As plaintiff's claims do not arise from a contract, the doctrine of equitable estoppel does not apply.

beneficiaries, among others.  (*Marenco, supra*, 233 Cal.App.4th at p. 1417; *Garcia, supra*, 11 Cal.App.5th at pp. 786, 788.) "These exceptions to the general rule that one must be a party to an arbitration agreement to invoke it or be bound by it 'generally are based on the existence of a relationship between the nonsignatory and the signatory, such as principal and agent or employer and employee, where a sufficient "identity of interest" exists between them.' " (*DMS Services, supra*, 205 Cal.App.4th at p. 1353.)

Courts look to traditional principles of contract and agency law to determine whether a nonsignatory can enforce an arbitration agreement signed by its principal or agent. (*Cohen v. TNP 2008 Participating Notes Program, LLC* (2019) 31 Cal.App.5th 840, 860 (*Cohen*).)  Allegations of an agency relationship with a signatory—without more—are generally insufficient to allow a nonsignatory defendant to enforce an agreement to arbitrate between a signatory defendant and a plaintiff.  (See *Barsegian v. Kessler & Kessler* (2013) 215 Cal.App.4th 446, 451 (*Barsegian*) [rejecting contention that plaintiff's allegation that each of the defendants was the agent of the other defendants entitled all defendants "to enforce each other's arbitration agreements," because "then in every multidefendant case in which the complaint contained such boilerplate allegations of mutual agency, as long as *one* defendant had entered into an arbitration agreement with the plaintiff, *every* defendant would be able to compel arbitration, regardless of how tenuous or nonexistent the connections among the defendants might actually be"]; but see *Thomas v. Westlake* (2012) 204 Cal.App.4th 605, 614 [nonsignatory defendants could enforce arbitration agreement because each was alleged to have

27

"acted as an agent of [signatory defendant] in connection with the acts and omissions" described in the complaint].)

A nonsignatory defendant, however, may "compel a signatory plaintiff to arbitrate where there is a connection between the claims alleged against the nonsignatory and its agency relationship with a signatory" defendant. (*Cohen, supra,* 31 Cal.App.5th at p. 863; accord, *Garcia, supra*, 11 Cal.App.5th at p. 788 [nonsignatory defendant could enforce arbitration agreement when it was alleged to have been joint employer with signatory defendant, and thus agent of signatory "in [its] dealings with [plaintiff]"].)  Put another way, "[n]onsignatory defendants may enforce arbitration agreements 'where there is sufficient identity of parties.' " (*Marenco, supra*, 233 Cal.App.4th at p. 1417.)

The trial court here found the complaint's allegations that the defendants were " 'all agents of each other' " were insufficient "to create an agency for the purposes of invoking the arbitration clause."  The complaint included general boilerplate allegations that each defendant acted as the other's agent, true.  But, the agency relationship between Westlake and the nonsignatory defendants is not simply based on a boilerplate mutual agency allegation, as in *Barsegian*.

As for the nonsignatory corporate defendants, the complaint alleged the corporate defendants—Westlake and the three Hankey defendants—jointly employed Zaklit and the individual defendants "at all times."  The complaint makes no distinction between the corporate defendants' joint employment of Zaklit, or of the individual defendants.  It also alleged the corporate defendants jointly failed to develop policies and inform their employees about the prohibition of discrimination,

28

harassment, and retaliation and to take corrective action against, or to deter, those who engaged in discrimination, harassment, and retaliation; alleged the corporate defendants and their "officers, directors, managing agents, managers, and supervisors knew, or should have known, of the acts" alleged in the complaint, and the corporate defendants approved of or ratified those acts. Moreover, every cause of action in the complaint, except the cause of action for gender violence alleged against only Ogbunamiri, is asserted against the corporate defendants jointly.

*Garcia, supra*, 11 Cal.App.5th 782, is instructive. There, a temporary staffing company—Real Time—hired Garcia and assigned him to work for Pexco. (*Id*. at p. 784.) Garcia signed an arbitration agreement with Real Time, but not with Pexco. (*Ibid*.) Garcia sued both Real Time and Pexco (and another defendant) for wage and hour violations that occurred during his assignment with Pexco, alleging they jointly employed him and acted as each other's agent. (*Id*. at p. 785.) The appellate court concluded Pexco, as a nonsignatory to Real Time's arbitration agreement with Garcia, could compel Garcia to arbitrate his claims against it under the agency exception based on Garcia's agency allegations and that the complaint's causes of action alleged identical claims and conduct regarding the workplace violations against "[a]ll [d]efendants without any distinction." (*Id*. at p. 788.)

Zaklit's complaint not only alleged Westlake and the nonsignatory corporate defendants were acting as agents of one another but, as in *Garcia*, the complaint alleges they also were her "joint employers fulfilling the same role," and asserted identical claims against them based on the identical set of facts

29

"without any distinction" between them. (*Garcia, supra*, 11 Cal.App.5th at p. 788.)

Zaklit nevertheless argues defendants' "failure to provide evidence as to the elements required for agency is fatal to the invocation of agency status." We disagree. The corporate defendants could not be jointly liable to Zaklit for the individual defendants' torts and their own workplace violations—as the complaint alleges—unless the corporate defendants were acting as each other's agents in their dealings with their employees—Zaklit and the individual defendants—as alleged joint employers. (See *Barsegian, supra*, 215 Cal.App.4th at p. 453, fn. 3 [explaining boilerplate allegations that defendants acted as each other's agents "can be sufficient to support a motion to compel arbitration even if the allegation is not treated as a judicial admission" when the defendants' liability was dependent upon the boilerplate agency allegation, which was not the case there].)

Moreover, although the court did not mention it in its ruling, defendants presented with their petition the declaration of the Vice President of Human Resources for Hankey Investment Company—Tonia Douglas—who averred Hankey Investment Company provides "human resource services" to the Hankey Group companies, which include all of the corporate defendants. Thus, at the time of Zaklit's alleged joint employment by the corporate defendants, defendant Hankey Investment Company was providing human resource services to Westlake, e.g., acting as its agent.[14] The complaint refers to this relationship. Zaklit

---

[14] Douglas also declared Hankey Finance Company has no employees, and, as we noted, defendants assert the Hankey Group is simply a name—rather than an actual entity—used to refer to the group of associated companies.

30

alleged Douglas was the Vice President of Human Resources, that she witnessed sexually harassing conduct directed at Zaklit, and that Zaklit reported the individual defendants' conduct from the October 2019 event to Douglas, who essentially did nothing. And, Zaklit received her new-hire documents from both Hankey Investment Company and Westlake.

In any event, Zaklit's allegations were sufficient to support the agency exception, entitling the nonsignatory corporate defendants to compel arbitration of Zaklit's claims under the DRA.

Zaklit's allegations against the individual defendants similarly establish they were acting as agents of Westlake. Beyond the "boilerplate" agency allegation, Zaklit specifically alleged the corporate defendants, including Westlake, employed the individual defendants as "officers, directors, managing agents, managers, and/or supervisors," and each individual defendant held a title reflecting their employment in that capacity: the Senior Vice President of Servicing (Renfro), the Director of Flooring (Torrez), and the Chief Investment Officer (Ogbunamiri).

The complaint also alleged that, when they engaged in the alleged sexually harassing conduct—which forms the basis of all Zaklit's causes of action—the individual defendants were supervisors under the FEHA, specifically, Government Code section 12926, subdivision (t). That section defines "[s]upervisor" as "any individual *having the authority, in the interest of the employer*, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or the responsibility to direct them, or to adjust their grievances, or effectively to recommend that action, if, in connection with the

31

foregoing, the exercise of that authority is not of a merely routine or clerical nature, but requires the use of independent judgment." (Gov. Code, § 12926, subd. (t), italics added.) In other words, the individual defendants had authority to act on behalf of Westlake and the other corporate defendants. And, as we discussed, the complaint alleged the corporate defendants "approved" of the acts alleged in the complaint or "ratified them after learning of them."

Moreover, although the complaint does not use the words "acted within the scope of their employment," Zaklit's causes of action all are based on sexually harassing conduct the individual defendants allegedly engaged in within the course and scope of their employment by Westlake (and the other corporate defendants): in the workplace generally, and at a three-day event the corporate defendants held for employees at a hotel in October 2019.

For example, Zaklit's cause of action for quid pro quo sexual harassment alleged her job, other terms of her employment, and the like, were "expressly or impliedly contingent upon" her acceptance of the individual defendants' unwanted sexual advances and verbal conduct—including the conduct that allegedly occurred at the hotel event in October 2019—while the defendants were acting as supervisors. Similarly, Zaklit's second cause of action for hostile work environment alleged the individual defendants were supervisors "at all times," and their conduct alleged in the complaint was unwelcome and "created an oppressive, hostile, intimidating, and/or offensive work environment" for her, and affected her "emotional well-being and her ability to do her job."

Zaklit's tort claims for intentional infliction of emotional distress, battery, implied threat of violence in violation of Civil

32

Code section 51.7, and gender violence under Civil Code section 52.4 also all are based on the individual defendants' conduct at the October 2019 work event where they allegedly had authority to act for Westlake (and the other corporate defendants) as supervisors, managers, managing agents, officers, or directors.

Accordingly, the complaint's allegations are sufficient to establish the individual defendants were acting as Westlake's agents, entitling them to enforce the DRA against Zaklit. (See *24 Hour Fitness, Inc. v. Superior Court* (1998) 66 Cal.App.4th 1199, 1210–1211 [allegations individual defendants allegedly sexually harassed plaintiff within the course and scope of their employment established they were acting as defendant employer's agents and thus they were entitled to summary judgment on ground the claims against them were subject to arbitration agreement between the plaintiff and defendant employer].)

**5.** ***We decline to consider the validity of the superseded agreements***

Finally, defendants contend that, if the arbitrator determines the DRA is unenforceable based on unconscionability, "it would be appropriate for the trial court to enforce either of the . . . two preceding arbitration agreements." Defendants argue a finding that the DRA is unconscionable and thus void would "vitiate the entire agreement, including the superseding clause," essentially reinstating the superseded arbitration agreements. Defendants did not make this argument in the trial court, although, as we discussed, they did argue the Application and/or Applicant's Statement also compelled Zaklit to arbitrate her claims if the DRA were unenforceable.

33

Defendants' claim is not ripe. It would be premature for us to determine whether the trial court should enforce the arbitration provisions under the Application and Applicant's Statement when the arbitrator has yet to determine the validity of the DRA. We note, however, as Zaklit argues, the authorities on which defendants rely to support their assertion that the "superseding clause" would be "vitiate[ed]"—and the earlier arbitration agreements reinstated—if the arbitrator finds the DRA is unconscionable—do not stand for that proposition. (See *Moncharsh v. Heily & Blasé* (1992) 3 Cal.4th 1, 29 ["If a contract includes an arbitration agreement, and grounds exist to revoke the entire contract, such grounds would also vitiate the arbitration agreement. Thus, if an otherwise enforceable arbitration agreement is contained in an illegal contract, a party may avoid arbitration altogether."]; *California State Council of Carpenters v. Superior Court* (1970) 11 Cal.App.3d 144, 157 ["illegality in a contract containing a provision for arbitration, in order to vitiate such provision, must be such as renders the entire contract illegal and unenforceable; and that a claim of illegality of one of the incidental clauses of the contract that falls short of affording ground for revocation of the contract is itself subject to arbitration"]; *Bianco v. Superior Court of Los Angeles County* (1968) 265 Cal.App.2d 126, 130 [plaintiff not required to arbitrate where entire agreement found revocable based on illegality].)

34

## DISPOSITION

The order denying defendants' petition to compel arbitration is reversed. On remand, the trial court shall stay the current litigation and allow Westlake to choose an arbitrator from JAMS, ARS, or AAA, as provided by the DRA. The arbitrator shall determine the validity of the DRA, or what should occur if the arbitrator finds the DRA is invalid or unenforceable. We express no opinion on the validity of the DRA, or what should occur if the arbitrator finds the DRA is invalid or unenforceable. The parties shall bear their own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

LAVIN, Acting P. J.

NGUYEN (KIM), J.*

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.